SUMMERS, Justice.
The Morehouse Natural Gas Co., Inc., is a privately owned public utility company under Louisiana law. It instituted this proceeding before the Louisiana Public Serv *335 ice Commission, to obtain a rate increase for natural gas furnished to consumers in the parishes of Morehouse and Ouachita. The Commission refused the proposed rates and the utility appealed to the district court which reversed the Commission and allowed the rate increase. Thereafter, the Commission appealed to this court which found the record inadequate and remanded the case in order to amplify the record with an appraisal of the Morehouse Natural Gas Co., Inc., system which could be considered by the Commission in its determination of the rates. (See 242 La. 985, 140 So.2d 646 (1960)).
On remand the Commission, after ordering the appraisal, again refused to establish the rates proposed by the utility. The utility company appealed a second time to the district court where additional evidence was taken. Then, as required by law, the matter was referred back to the Commission which affirmed its second order. Thereafter, the district court again reversed the Commission and this appeal followed.
It is an undisputed fact that Morehouse Natural Gas Co., Inc., acquired the plant and properties of the former Mer Rouge Gas Company on January 21, 1960, for the consideration of $20,000.00. There is no question but that the actual sale of these properties and, in particular, the price thereof, was greatly influenced by factors other than an arms-length transaction. Prior to the date of sale, the Mer Rouge Gas Company was a wholly owned subsidiary of United Carbon Company, constituting an insignificant part of United Carbon’s overall operations. United Carbon was threatened with regulation by the Federal Power Commission unless it divested itself of the properties of the Mer Rouge Gas Company. Morehouse Natural Gas Co., Inc., being the only willing purchaser, acquired the facility for $20,000.00 which was far below its value or original cost.
In August 1960, approximately six months after this purchase, Morehouse filed application with the Commission to increase its rates to a point that would insure a return of six percent on its property rate base which it represented to be $186,-790.00. This figure was arrived at by estimating the original cost at $233,488.00, and depreciating this figure by 20 percent to obtain an estimated depreciated value of the system. An estimate being required in this instance because the cost figures were not available from the records of the predecessor company.
The proposal was denied by the Commission, which refused to fix the rate base at $186,790.00. Instead, the rate base was established in the sum of $44,076.00. This latter sum represented the purchase price by Morehouse from United Carbon ($20,-000.00), plus 50 percent of purchase price ($10,000.00), plus the cost of additions made by Morehouse subsequent to acquisition ($14,076.00). Morehouse objected to this determination and appealed to the district court, which rendered judgment in its favor approving the depreciated rate base of $186,790.00 and the schedule of rates proposed by Morehouse.
The Commission then appealed to the Supreme Court. In the opinion of this court, because the original costs of the facilities used and useful in the utility system were not available, the record was inadequate to permit a proper determination of the issues on the basis of the prudent investment theory in use by the Commission, requiring the utilization of original costs, less depreciation, for establishing the rate base. The case was accordingly remanded to the Commission with instructions that an unbiased appraisal be made for the Commission’s consideration in arriving at the appropriate rate base.
On remand, the Commission appointed Mr. J. H. Fonner, a retired consulting engineer, to make the appraisal ordered by this court. Mr. Fonner made an on-the-ground examination and inspection of the properties and arrived at a depreciated value of $155,497.00. This appraisal was *336 made without the benefit of any records showing what the various original costs were or when they were incurred. Nor did the appraisal take into consideration certain improvements which were made after Mr. Fonner’s inspection and included in a later appraisal made on behalf of Morehouse by Mr. R. D. Hodges of Pan American Engineers.
The Hodges appraisal was made with the benefit of information showing the initial investment to have been made in 1924. However, there was no information as to the amount of the initial investment nor the cost of the additions to the utility’s establishment during the period from 1924, its beginning date, to 1942. Mr. Hodges estimated that the investment during this period amounted to $179,394.00.
Because the initial outlays are greater in a new system, and, to accomplish what he considered to be a conservative result, Hodges related all of the additions made during this 18-year period back to 1924. Using the straight line method he then depreciated them on a 58-year basis or 1.7 percent rate because, in his opinion, from physical observation, they had a life expectancy of another 20 years from the time of his examination. The examination, it should be mentioned, occurred in 1962.
The information available to Plodges for the period between 1942 and the date of acquisition in 1960 did disclose the cost of the additions and when they were made. He utilized the straight line method and the same rate of depreciation for this latter period which he had utilized for the 1924-1942 period, calculating the depreciation from the actual dates the additions were made.
During the course of these second proceedings before the Commission, Morehouse filed a supplemental petition disclosing a total investment of $58,758.00 since the 1960 acquisition date, which it requested be considered in establishing the rate base. As to these undisputed additions, Hodges applied the book depreciation of 331/3 years or 3 percent which was being claimed by the company in the exhibits attached to its supplemental petition. His total evaluation of the system as depreciated, with these supplemental figures added, was $171,570.00.
Mr. Laing, an experienced plumber residing in the village of Mer Rouge, gave an estimate of the present day cost of various items included in the properties of the utility. The evidence elicited from him indicates that the present day cost of the entire system would be $196,377.49. This figure, of course, does not contemplate depreciation, nor does it entail consideration of various factors which could add to the system’s value, such as rights-of-way, vehicles, offices, etc. It deals only with the plumbing facilities involved in the system.
At the time of its application, Morehouse was serving 875 gas customers over a sprawling rural area with some of its customers located 30 miles from its home office. Since purchasing this system, it has used rates which have been in effect since May 1939, with the exception of the rates charged domestic consumers within and adjacent to the village of Mer Rouge which were placed in effect by approval of the Commission in 1951. Under this rate system in effect at the time of the application, Morehouse was experiencing a loss.
The existing rates of Morehouse represent an average annual cost to the customer of $59.00, whereas, the proposed rates would result in an average annual cost of $87.00 per customer. This latter figure compares favorably with $87.60 average annual cost per customer United Gas Corporation is presently charging in a rural service area adjacent to that of Morehouse. Likewise, the Arkansas-Louisiana Company has a rate known as the “Stonewall” rate, not too far from Morehouse’s system, which results in an average annual cost of $84.60 per customer. On the other hand, the rate proposed by Morehouse contrasts with that charged in Bastrop, which results in an average annual cost of $55.53 per customer. Other rates in that area are lower than *337 those proposed by Morehouse. The difference is understandably explained to be due to the wide, sparsely populated area served in the higher rate systems as contrasted with the smaller areas and more concentrated population in the other systems.
Upon the basis of the rate first established by the Commission, computed at six percent on a rate base of $44,076, rather than $186,790, the present owners will be earning approximately $3.00 per year per customer, or roughly twenty-five cents per month. The rate base of $44,076 represents an investment of used and useful property of the utility devoted to public use of roughly $50.00 per customer, less than the cost of acquiring and installing one meter. By contrast, the record supports a finding that a system such as this is ordinarily valued in the neighborhood of from $200 to $250 per customer.
Another significant factor is the sparsity of records concerning the system prior to acquisition by Morehouse. For this reason almost twice as much gas line was discovered in the system as had been carried on the predecessor company’s books. This disclosure occurred when a physical inventory was made after the purchase. Some of this line had probably been carried by Union Carbon Company in its gathering system, as the gas for the Mer Rouge system was at one time furnished by Union’s wells located nearby. Many of the users of the gas during the Mer Rouge era were employees of Union Carbon who were not charged.
When the hearing was completed on remand, the Commission issued its order in which it recalculated the original cost as depreciated of the properties of the utility devoted to the public use prior to January 1960. To do this, it used the original cost estimates shown in the Hodges appraisal. However, to this cost the Commission applied a 33}4 year basis or 3 percent per annum rate of depreciation instead of the 58-year life expectancy or 1.7 per cent rate of depreciation used by Mr. Hodges.[1] This resulted in a depreciated value of the property installed from 1924 to 1960 of $36,114, as compared with $112,812 in the Hodges appraisal. In effect, this was a reaffirmance of the Commission’s original order. To this amount the Commission added the depreciated value of the additions made since January 1960, amounting to $58,758. On the basis of the above calculations, therefore, the total rate base of the Morehouse Natural Gas Company was $94,872, as compared with the $171,570 total of the Hodges appraisal. A rate of return of 6 percent was allowed on this rate base. Morehouse, being dissatisfied with this determination, again appealed to the district court where additional evidence was heard, and, as required in such cases before disposition by the district court, the matter was re *338 ferred back to the Commission for consideration of the effect of the new evidence on its order.
On this reconsideration the Commission noted for the first time that the predecessor company to Morehouse filed annual reports for the years 1955 and 1956, which were in the Commission's files, reflecting the following plant (rate base) figures:
Year 1955
Gross plant - $92,009.61
Less depreciation- 56,953.93
Net plant-$35,055.68
Year 1956
Gross plant - $95,599.06
Less depreciation reserve- 60,771.28
Net plant _$34,827.78
The Commission was of the opinion that these disclosures strengthened the reasons for the rate base it had established and so it reaffirmed its second order.
The district court then revoked the order of the Commission and established a rate base in the amount of $171,570 based on Mr. Hodges’ appraisal and report. The Commission then appealed to this court.
The trial court found, and we agree, that essentially Morehouse is relying upon the basic principle, which is well-established in the jurisprudence, that the rate of return in this case (six percent) is to be computed upon the basis of the original cost of the system less depreciation, rather than $20,000 representing the actual cost of the system to Morehouse.
From exhibits, stipulations and testimony it is clear that the method uniformly and consistently followed by the Commission in establishing the rate base of a public utility is to use the cost to the investor who first placed the utility in operation, less depreciation, without regard to any actual purchase price which may have been involved in subsequent sales of the utility. This principle has been applied by the Commission whether the purchase price in the subsequent sale is greater or less than the original cost less depreciation.
Thus it is the Commission’s practice in establishing a rate base for a utility of this kind to utilize what is known as the prudent investment theory. Nearly twenty years ago the Commission served formal notice on the utility industry that it had adopted the prudent investment theory of fixing rates by its Order No. 4346, which provides in part:
“Fundamentally, the ‘prudent investment’ theory was based on the two concepts that (1) the thing which is required to be protected in order to avoid confiscation under the Constitution is the money invested in used and useful property and not the ever changing and illusory value of the property and (2) that so long as the investor is allowed to earn a rate of return which will attract purchasers for his interest and allow him to sell his interest and recoup his money invested, there will not be any Constitutional confiscation. Naturally, these concepts were based upon the assumptions that the public interest in the public utility business is of sufficient importance and that the economic necessity for actual freedom from wasteful competition in the public utility business is sufficiently well-founded as to justify the elimination of the possibility of capital gain by increase of the value of the investment. But the theory also assumes that the investment is made freely and without compulsion, so that if the investor desires to put his money into some other business where there is the probability of capital increase, so long as the rate of return available is sufficient to attract purchasers for his interest, he cannot claim confiscation.
“Although the Massachusetts version of ‘prudent investment’ regulation of public utilities had been in use there *339 for many years, this Brandéis 'prudent investment’ theory suffered many defeats at the hands of the courts during the succeeding years. But the acceptance of its validity and usefulness made some progress and finally, in 1944, the United States Supreme Court in the Hope Natural Gas Company Case (1944) 320 US 591, 88 Led 333, 51 PUR (NS) 193, 64 S Ct 281, laid the ghost of Smyth v Ames, supra, to rest and left regulatory Commissions free to build the rate regulation process on ‘prudent investment,’ as far as the Federal Constitution is concerned. Commissions are left free to make pragmatic adjustments zvithin the statutory (and judicial) ambit of their authority.” (Emphasis supplied.)
This particular case requires such a pragmatic adjustment because of its unusual circumstances.
The fixing of “just and reasonable” rates involves a balancing of investor and consumer interests. Obviously, there can be no single formula or principle which will insure just and reasonable rates in every given case. It is the result reached, not the method employed, which is controlling and, therefore, the Commission, in establishing the rate base of a utility, is not required to follow any particular formula. Federal Power Commission v. Hope Natural Gas Company, 320 U.S. 591, 64 S.Ct. 281, 88 L.Ed. 333 (1943); Southern Bell Telephone & Telegraph Company v. Lousiana Public Service Commission, 232 La. 446, 94 So.2d 431 (1957).
The validity of the foregoing propositions of law is recognized by all parties here. What is at issue is the application of those legal principles to a proper determination of the facts of this case and, particularly, what is the proper rate of depreciation to be applied here.
The rate of depreciation to be applied is the particular issue because the Commission has utilized a 331/j year basis or 3 percent rate and Hodges has used a 58-year basis or 1.7 percent rate for the period from 1924 to 1960, although the same estimated original costs are used in both computations.
The 3 percent rate was applied to the 1924-60 period by the Commission because Morehouse had used it in its calculations for the period after 1960. If it be conceded that the 3 percent rate of depreciation is a standard in general use by utilities similarly situated, it should be recognized that the application of that rate of depreciation in the prudent investment theory contemplates that all relevant facts and figures concerning costs and dates of investments in things used and useful in the utility are known as was the case in the period after 1960.
Such a situation does not exist in the case at bar.
Throughout the hearings and trials had in this case, it became clear that there were few records of the costs and dates of investments made during Mer Rouge’s ownership.
Although the Commission made reference in its order to two annual reports filed by the Mer Rouge Company in 1955 and 1956, these reports had not been mentioned before, and no testimony of any kind was offered by the Commission about them. These reports are not in the record and were not, therefore, considered by the trial court and are not available for our study. Their use constitutes. a belated production of old records from the files of the Commission which were not offered in evidence, the accuracy of which is not shown and which the utility has had no opportunity to rebut. The offering is a partial picture; it does not wholly satisfy the deficiency in the record which this court observed in our first consideration. And, too, as we have heretofore noted, the records of the Mer Rouge Company did not purport to cover the entirety of the system now attributed to it and which the present owners must maintain.
*340 By accepting the $179,570 costs contained in the Hodges appraisal for the initial period of 1924-1942, which were all related back to 1924 by Hodges, and by applying the 3 percent rate of depreciation to that figure, the Commission has depreciated that investment out of existence. Thus a substantial portion of the pipe used and useful in the system, which had not been carried on the books of Mer Rouge, and concerning which no depreciation had been previously claimed, is not considered in the rate base used by the Commission. The Commission action in this respect is improper. The total amount of $179,570 was not invested in 1924; and Hodges, in an abundance of caution, merely related it back to that date and adopted a 58-year basis for his computation of depreciation. This was a pragmatic adjustment indicated by the circumstances.
If the Commission chose to apply the 3 percent rate of depreciation to the 1924-42 period, in order to be consistent, it should have made proper allowance for the distribution of costs during that period as was done in the other period (1960 on) where the 3 percent rate was applied by Morehouse. In failing to make such an adjustment, and by using the same rate of depreciation for both periods, a fundamental error occurred whereby the investments before 1942 were depreciated out of existence. The Commission’s application of the same rate of depreciation to actual cost in one instance and an estimated cost in the other instance is neither consistent, just nor rational, and would lead to a consequence to the utility no different from the Commission’s first order.
It is true that the Hodges appraisal utilizes two rates of depreciation, and for that reason it may be claimed that it, too, is inconsistent and irrational. However, according to that computation, definite information was available for the period after 1960 when the 3 percent rate was utilized, whereas for the beginning period, 1924-1942, there was sparse information concerning the amounts invested or the dates when investments were made, consequently a pragmatic adjustment was made to bring about a fair result; and this required the 1.7 percent rate of depreciation based upon the 58-year period.
In view of the absence of records of the predecessor company, the additional gas line in the Morehouse system not considered to be in the predecessor system, the loss-experience of Morehouse and the other facts we have noted, the only way to determine the original cost factor was by appraisal. The Commission’s acceptance of the original costs in that appraisal and its rejection of the rate of depreciation used therein by Morehouse for the 1924-42 period constitute an unrealistic approach. The arbitrary solution it did adopt entitles the utility to relief.
There is no “theoretically correct” solution to the choice of a wise, workable basis of depreciation that will apply to all factual situations. Clark’s Ferry Bridge Co. v. Public Service Commission of Commonwealth of Pennsylvania, 291 U.S. 227, 54 S.Ct. 427, 78 L.Ed. 767 (1933). However, the Hodges approach for the 1924-42 period is more consistent with a just and rational solution and it brings about a midstream result which satisfies constitutional requirements of reasonable and just rates and a fair return for the utility. Bluefield Water Works & Improvement Co. v. Public Service Commission, 262 U.S. 679, 43 S.Ct. 675, 67 L.Ed. 1176 (1923). It is based upon the only fair and ascertainable standard of evaluation of original cost available in this case in order that acceptable concepts involved in the prudent investment theory may be applied.
Therefore, the use by Hodges, Morehouse’s appraiser, of the 58-year or 1.7 percent rate of depreciation for the estimated original costs of $179,394 incurred in the 1924—1942 period was proper. However, the application of that same rate of depreciation to the known additions made during the 1942-1960 period is incon *341 sistent and lacks a proper basis in reason. The costs of additions and the dates when the additions were made during the 1942-1960 period were known, and Hodges should have applied the 33j/3 year or 3 percent rate of depreciation to those cost factors. They are shown in footnote 1 hereinabove.
There being no dispute about the period after 1960, the rate of depreciation and costs of additions utilized for that period will be approved by us.
For the reasons assigned, the judgment of the district court is amended to the extent that the Commission is ordered to recalculate the rate base of Morehouse, applying the 1.7 percent rate of depreciation to the original cost factor of $179,394, related back to 1924, and the 3 percent rate of depreciation to the known cost of additions after 1942, allowing a 6% rate of return on the rate base thus determined.
FOURNET, C. J., absent.

. Depreciated Plant of Morehouse Natural Gas Company Using 3% Per An-num (33% Years Life) Instead of 58 Years
Orig. Cost Age in Tears to 1960 Years x Rate Total Depr. Balance |(j§)
1924 $179,394 36 108 $179,394 CO
1942 10,833 18 54 5,852 4,981 CO
1945 14,819 15 45 6,668 8,151 CO
1946 1950-51 5,337 5,789 14 m 42 28.5 2,242 1,649 3,095 4,140 CO CO
1952 10,831 8 24 2,599 8,232 CO
1954 6,921 6 18 1,246 5,675 CO
1958-59 1,92-6 m 4.5 86 1,840 CO
$235,850 $199,736 $36,114
Net additions since January 1960 58,758
Total Depreciated Plant $94,872