594 So.2d 357 (1992)
SOUTH CENTRAL BELL TELEPHONE COMPANY
v.
LOUISIANA PUBLIC SERVICE COMMISSION.
No. 91-CA-0907.
Supreme Court of Louisiana.
January 17, 1992.
Additional Concurring and Dissenting Opinion February 13, 1992.
Rehearing Denied February 27, 1992.
*358 Herschel Abbott, Edward H. Bergin, Jones, Walker, Waechter, Poitevent & Carrere, Larry S. Bankston, Donald A. Hoffman, Hoffman, Sutterfield, Ensenat & Bankston, Robert L. Rieger, Michael Fontham, Paul L. Zimmering, Noel J. Darce, Laurie Barcelona Halpern, Stone, Pigman, Walther, Wittman & Hutchinson, William J. Guste, Jr., Atty. Gen., Richard M. Troy, J. David McNeill, Asst. Attys. Gen., for appellants.
Paul H. Spaht, Kantrow, Spaht, Weaver & Blitzer, Katherine W. King, Kean, Miller, Hawthoren, D'Armond, McCowan & Jarman, Deborah J. Winegard, Kenric E. Port, Michael Henry, for appellee.
Additional Concurring and Dissenting Opinion of Chief Justice Calogero February 13, 1992.
DENNIS, Justice.
This proceeding was initiated by the Louisiana Public Service Commission to decrease the telephone rates of South Central Bell Telephone Company in Louisiana (SCB). AT & T Communications of the South Central States, MCI Telecommunications Corporation, and the state were granted leave to intervene. Prior to the commencement of the rate proceedings the Commission issued an order announcing an investigation and placing the utility on notice that $32 million of its annual revenues were subject to refund if its rates proved to be excessive. After extensive rate hearings, the Commission ordered a decrease in the utility's rate of return from 14.75% to 12.75% and a decrease in its rates so as to effect a decrease in its annual revenues of $35,398 million; and the Commission ordered the utility to refund customers $34,981,000 representing the excess collected by the utility over the new rates during the rate investigation and proceeding.
South Central Bell appealed to the district court, which affirmed the rate decrease, but reversed the refund order. The utility, the Commission and the state appealed to this court.
The only issues presented by the appeals that warrant extensive discussion by this court are: (1) Whether the Commission's order requiring the utility to refund to its customers all revenues over and above the new rate level collected during the rate investigation and proceeding constituted prohibited retroactive ratemaking; and (2) Whether the Commission acted arbitrarily, capriciously or unreasonably by disregarding the utility's actual capital structure and using a hypothetical capital structure for rate making purposes without first finding that the actual structure was the product of unreasonable or imprudent investments. The other issues are adequately dealt with by the district court's opinion, except in one instance in which our disagreement can be stated summarily, and do not call for the discussion or elaboration of any issues of law.

1. Retroactive Rate Making & Refund
On April 27, 1988, defendant, the Louisiana Public Service Commission, on its own motion initiated a general investigation of the revenues and rate of return of the plaintiff-appellant South Central Bell Telephone Company primarily to determine whether the utility's earnings had been excessive and whether its rates should be decreased. In its Order No. U-17494 of that date the Commission announced the beginning of its investigation and placed SCB on notice that during the probe the utility would be permitted to maintain its current rates in effect, but that $32 million of the annual intrastate revenues of the company would be collected subject to refund, and a refund would be ordered if the Commission determined that the utility's rates were excessive. Extended hearings *359 were held, and on May 25, 1989, the Commission issued its decision No. U-17949-A finding the rates to be excessive and ordering the Company to reduce its rates so as to decrease its future revenues $35,398,000 annually and reduce its rate of return from 14.75% to 12.75%. Three weeks later, on June 16, 1989 by decision No. U-17949-B the Commission also ordered the utility to refund to customers $34,981,000 collected during the pendency of the investigation in excess of the new rates prescribed by the Commission in its May 1989 order.
The function of ratemaking is legislative in character whether it is exercised directly by the legislature or by a regulatory agency to which the power to fix rates has been delegated. Arizona Grocery Co. v. Atchison, Topeka & Santa Fe Ry. Co., 284 U.S. 370, 52 S.Ct. 183, 76 L.Ed. 348 (1932); Louisiana Power & Light Co. v. Louisiana Pub. Serv. Comm'n, 523 So.2d 850 (La.1988); Louisiana Power and Light Co. v. Louisiana Pub. Serv. Comm'n, 377 So.2d 1023 (La.1979). Accordingly, it is well established that the exercise by the Public Service Commission of its ratemaking authority is primarily a legislative function, which, in the absence of constitutional or statutory authority to the contrary, is limited to fixing rates to be applied prospectively. South Central Bell v. Louisiana Pub. Serv. Comm'n, 555 So.2d 1370 (La.1990); Louisiana Power & Light Co. v. Louisiana Pub. Serv. Comm'n, 523 So.2d 850 (La.1988); Public Utilities Comm'n of Ohio v. United Fuel Gas Co., 317 U.S. 456, 63 S.Ct. 369, 87 L.Ed. 396 (1942); In re Petition of Minnesota Power & Light Co., 435 N.W.2d 550 (Minn.App.1989); In re Petition of Elizabethtown Water Co., 107 N.J. 440, 527 A.2d 354 (1987).
This concept is inherent in our constitutional provisions which establish in general terms the powers of the Commission to "regulate all common carriers and public utilities and have such other regulatory authority as provided by law," but authorize the agency to require a utility to make refunds only when a provisional rate increase is disallowed or reduced before it becomes final. La. Const. Art. IV, § 21(B). Similarly, the legislature has authorized the Commission to exercise regulatory power "for the purpose of fixing and regulating the rates charged or to be charged" by public utilities, La.R.S. 45:1163, but has recognized its power to order a refund in only one special situation, viz., when a temporary or provisional rate increase is disallowed, in whole or part, before its finality. La.R.S. 45:1163.1.
Generally, retroactive rate making occurs when a utility is permitted to recover an additional charge for past losses, or when a utility is required to refund revenues collected pursuant to its lawfully established rates. Louisiana Power & Light Co. v. Louisiana Pub. Serv. Comm'n, 523 So.2d 850 (La.1988); In re Petition of Elizabethtown Water Co., 107 N.J. 440, 527 A.2d 354 (1987); In re Central Vermont Pub. Serv. Corp., 144 Vt. 46, 473 A.2d 1155 (1984); Cheltenham & Abington Sewerage Co. v. Pennsylvania Pub. Util. Comm'n, 344 Pa. 366, 25 A.2d 334 (1942); Chesapeake and Potomac Tel. Co. of West Virginia v. Public Serv. Comm'n of West Virginia, 171 W.Va. 494, 300 S.E.2d 607 (1982); State ex rel. Utilities Comm'n v. Edmisten, 291 N.C. 451, 232 S.E.2d 184 (1977). A commission-made rate furnishes the applicable law for the utility and its customers until a change is made by the Commission. Michigan Bell Tel. Co. v. Michigan Pub. Serv. Comm'n, 315 Mich. 533, 24 N.W.2d 200 (1946). Therefore, the utility is entitled to rely on a final rate order until a new rate in lieu thereof is fixed by the Commission. Arizona Grocery Co. v. Atchison, Topeka & Santa Fe Ry. Co., 284 U.S. 370, 52 S.Ct. 183, 76 L.Ed. 348 (1932); Michigan Bell Tel. Co. v. Michigan Pub. Serv. Comm'n, 315 Mich. 533, 24 N.W.2d 200 (1946). Consequently, the revenues collected under the lawfully imposed rates become the property of the utility and cannot rightfully be made the subject of a refund. Michigan Bell Tel. Co. v. Michigan Pub. Serv. Comm'n, 315 Mich. 533, 24 N.W.2d 200 (1946).
A utility is entitled only to the opportunity to earn a reasonable return on its investment; the law does not insure that it *360 will in fact earn the particular rate of return authorized by the Commission or indeed that it will earn any net revenues. Southern California Edison Co. v. Public Utilities Comm'n, 20 Cal.3d 813, 144 Cal. Rptr. 905, n. 8, 576 P.2d 945, n. 8 (1978) citing Power Comm'n v. Pipeline Co., 315 U.S. 575, 590, 62 S.Ct. 736, 745, 86 L.Ed. 1037 (1942); Bluefield Co. v. Public Serv. Comm'n, 262 U.S. 679, 692-693, 43 S.Ct. 675, 678-679, 67 L.Ed. 1176; Re General Tel. Co. of Cal., 69 Cal.P.U.C. 601, 610 (1969); Oakland v. Key System Transit Lines, 52 Cal.P.U.C. 779, 786 (1953). By the same token, if the utility's profits turn out to be higher than had been forecast by the Commission in setting the rates, the law does not penalize the Company for its efficiency by requiring a divestiture of unanticipated earnings. In re Petition of Elizabethtown Water Co., 107 N.J. 440, 527 A.2d 354 (1987); Connecticut Light & Power Co. v. Department of Pub. Util. Control, 40 Conn.Sup. 520, 516 A.2d 888, 897 (1986); B & O R.R. Co. v. Pennsylvania Public Utility Commission, 136 Pa.Super. 517, 7 A.2d 488, 491 (1939). The Commission's recourse is to fix a new rate prospectively and not to change the rates retroactively. In re Petition of Elizabethtown Water Co., 107 N.J. 440, 527 A.2d 354 (1987).
Applying these precepts, we conclude that the Commission exceeded its powers and engaged in retroactive rate making when it ordered the company to refund earnings derived from approved rates. The Commission had fixed the company's rates in 1984 after a comprehensive rate case and had amended them slightly on March 1, 1988 in an abbreviated proceeding. The Commission allowed these rates to become final without seeking judicial review. South Central Bell v. Louisiana Pub. Serv. Comm'n, 555 So.2d 1370, 1373, n. 3, 1375 (La.1990). Subsequently, it notified the company on April 22, 1988 of its contemplated investigation and proceeding against the utility for a rate decrease and refund because of excessive earnings. The extended proceedings that followed revealed that the company had never collected unlawful or improper rates or departed from its filed tariffs. Nevertheless, the Commission determined that the company had been earning too much, fixed its rates at a lower level and ordered it to refund earnings in excess of these rates to customers retroactively to April 22, 1988. The Commission's refund order was clearly an act of retroactive rate making because it divested the company of earnings it had properly derived from then lawful rates fixed by a final order of the Commission. Consequently, the trial court's judgment correctly set aside the refund order and should be affirmed in this respect.
It is argued that the Commission's order of April 22, 1988 putting the company on notice of a possible future rate reduction and refund order had the effect of suspending either the company's rates or its revenues or both. From this it is further contended that the company's earnings after April 22, 1988 were not derived from final and valid rates and did not become company property. But the Commission's order as issued did not purport to have any of these effects. It stated, in pertinent part:
Accordingly, it is ORDERED that:
1. During the pendency of this Docket $32 million of the annual revenues of South Central Bell Telephone Company produced by its Louisiana intrastate operations shall be collected subject to refund. Until the Commission considers the full record in these proceedings or issues a subsequent Order, the Company shall be permitted to maintain its current rates in effect. Refunds shall be ordered only if the Commission ultimately determines that South Central Bell's current rates are excessive. * * *
These clear and unambiguous words state plainly that no present change in the status of the company's rates or revenues was caused by the order; that a reduction in rates and a refund would be ordered only after a full hearing and a determination that the current rates were excessive. Therefore, the order's reference to "revenues of South Central Bell Telephone Company" must be taken at face value as indicating *361 that the earnings continued to be the property of the company; and the statement that $32 million of these revenues "shall be collected subject to refund" can logically be interpreted only as a notice to the company that it would be required to divest itself of this amount if and when a refund order had been issued after a full hearing.
The Commission cites a number of cases that it contends support the proposition that a regulatory agency may suspend rates and order refunds retroactively. These cases are all distinguishable except one which is so eccentric as to have no precedential effect outside its own jurisdiction.
Most are distinguishable because in them the Commission was specifically authorized to take the action in question by an express statutory provision. In Narragansett Elec. Co. v. Burke, 505 A.2d 1147 (R.I. 1986) the statutory powers of the commission expressly included the authority to order a utility to make refunds even of amounts collected under final rates. The Commission was given "... the power ... to provide remedial relief from unjust, unreasonable, or discriminatory acts, or from any matter, act or thing done by a public utility ... [and] to order the public utility to make restitution to any party or parties, individually or as a class, injured by said prohibited or unlawful acts...." The court in that case simply construed the statute to empower the commission to retrospectively order the utility to make refunds to consumers upon finding its rates excessive. In New Rochelle Water Co. v. Public Serv. Comm'n, 31 N.Y.2d 397, 340 N.Y.S.2d 617, 292 N.E.2d 767 (1972) a statute provided that where temporary rates authorized by the commission are inadequate, the commission "may by order authorize appropriate reparation to the company." The court of appeal held that the commission acted within its powers in denying the utilities' request to apply permanent rate increases retroactively to permit utilities to recoup from consumers. In Petition of Minnesota Power & Light Co., 435 N.W.2d 550 (Minn.App.1989) a statute provided that "[i]f, at the time of its final determination, the commission finds that the interim rates are in excess of the rates in the final determination, the commission shall order the utility to refund that excess amount collected under the interim rate schedule." The court of appeal held that under the statute the commission had authority to order refunds which reduced interim rates below previously authorized rates. In Transcontinental & Western Air v. Civil Aeronautics Bd. 336 U.S. 601, 69 S.Ct. 756, 93 L.Ed. 911 (1949) the Civil Aeronautics Act of 1938, as amended, empowered the Board to fix and determine the fair and reasonable rates of compensation for the transportation of mail by aircraft and "to make such rates effective from such date as it shall determine to be proper * * * ". The Supreme Court held that the legislative history indicated that the "make effective" clause was inserted only to make clear that the rates could be made retroactive to the date of the application. In United States v. New York Central R.R. Co. 279 U.S. 73, 49 S.Ct. 260, 73 L.Ed. 619 (1929) the Supreme Court construed the Act of July 28, 1916, giving the Interstate Commerce Commission power to adjust the compensation of the railroads for carrying the mails, to authorize the Commission to make its order changing the rate of pay operative from the date of the filing of the application.
Another case is distinguishable because in that case, unlike the situation in the present case, the commission did not attempt to order the refund of revenues collected under final rates but simply asserted the right to require refunds of temporary interim rates which it had granted specifically conditioned upon this right. In Pueblo Del Sol Water Co. v. Ariz. Corp. Comm'n, 160 Ariz. 285, 772 P.2d 1138 (Ariz.App.1988) the Arizona Corporation Commission approved one water company's application to take over the certificate of another and granted interim rates subject to the condition that they were subject to refund or reconciliation at a formal rate and transfer hearing to be held later. The court held that since the formal rate hearing had not yet been held, there were no *362 final rates and therefore no retroactive rate making had occurred.
A final case relied upon by the Commission is so eccentric that it cannot claim to have any precedential value outside of its own jurisdiction. In United Telephone Co. of Florida v. Mann, 403 So.2d 962 (Fla. 1981) the court held that the commission had inherent authority to order a refund of any amounts collected by the company during an interim rate decrease proceeding, in the face of a clear statutory directive proscribing retroactive rate making and "uniform precedents both in and out of Florida construing precisely that legislative limitation against the commission's action in this case." Id. at 968 (England, J. dissenting). The decision is perhaps understandable, as a practical matter, because the legislature had recently chosen to confer upon the commission the very authority it claimed in the case, but because the statute was prospective only it did not govern the litigation. Also, the court had previously approved the commission's inherent authority to make interim rate increases, so that the present case could be viewed as equitably continuing the "flip side" of an earlier practice.
For these reasons we conclude that the Commission's April 22, 1988 order did not deprive the company's rates of their finality or validity and by the same token did not deprive the company of the full ownership and use of the revenues derived therefrom. Consequently, it is clear that the Commission's subsequent refund order was an invalid attempt to engage in retroactive ratemaking by depriving the company after the fact of funds earned under rates valid at the time. In view of our conclusion in this regard it is not necessary to pass on other dubious and troublous arguments by the Commission, viz., the propositions that the Commission is empowered by the constitution not only to fix rates but also to impair or completely shut down a utility by actually suspending its rates and revenues; and that a suspension of rates or revenues does not constitute a taking of property requiring adequate notice and some kind of hearing.

2. Choice Of Capital Structure
The generally accepted method of computing the fair rate of return is the "cost of capital" approach. The fair rate of return is essentially the same as the overall cost of capital. See South Central Bell v. Louisiana Pub. Serv. Comm'n, 352 So.2d 964, 970 (La.1977). The cost of capital may be defined briefly as the annual percentage which a utility must receive to maintain its credit, to pay a return to the owners of the enterprise, and to insure the attraction of capital in amounts adequate to meet future needs. Mathematically, the cost of capital is the composite of the cost of the several classes of capital used by a utilitydebt, preferred (and preference) stock, and common stock (par value plus earned and capital surplus)weighted on the basis of an appropriate capital structure. Phillips, The Regulation of Public Utilities at 369.
The first step in estimating the overall cost of capital is choosing the appropriate capital structure for regulatory purposes. This selection is crucial because the cost of equity capital is usually higher than the cost of debt capital, both generally and for South Central Bell.
The Commission disregarded South Central Bell's actual capital structure of 40.55% debt and 59.45% equity and based its determination of the cost of capital on an optimal hypothetical structure of 50% debt and 50% equity constructed from the testimony of its own expert witness. The Commission did not find that the utility's existing capital structure was unreasonable or the result of imprudent investment practices. The effect of the Commission's decision was to reduce the cost of capital, the rate of return, and consequently the revenue requirement to be raised by the rates by some $9 million annually. The end result, of course, was that the Commission fixed significantly lower rates than it would have if it had used the utility's existing capital structure.
Justice Brandeis described the cost of capital and its relationship to the rate of return as follows: "In essence, there is no difference between the capital charge and *363 operating expenses, depreciation, and taxes. Each is a part of the current cost of supplying the service; and each should be met from current income. When the capital charges are for interest on the floating debt paid at the current rate, this is readily seen. But it is no less true of a legal obligation to pay interest on long-term bonds, entered into years before the rate hearing and to continue for years thereafter; and it is true also of the economic obligation to pay dividends on stock, preferred or common. The necessary cost and hence the capital charge, of money embarked recently in utilities, and of that which may be invested in the near future, may be more, as it may be less, than the prevailing rate of return required to induce capital to enter upon like enterprises at the time of a rate hearing ten years hence. To fix the return by the rate which happens to prevail at such future day opens the door to great hardships. Where the financing has been proper, the cost to the utility of the capital required to construct, equip, and operate its plant should measure the rate of return which the Constitution guarantees opportunity to earn. * * * The adoption of the amount prudently invested as the rate base and the amount of the capital charge as the measure of the rate of return would give definiteness to these two factors involved in rate controversies * * * *." Missouri ex rel Southwestern Bell Tel. Co., 262 U.S. 276, 306, 43 S.Ct. 544, 552-553, 67 L.Ed. 981 (1923) (Brandeis, J., with whom Holmes, J. joined, concurring).
South Central Bell contends that its existing capital structure represents an aggregate of investments that must be presumed to have been prudently made until shown otherwise and that consequently the utility is entitled to a reasonable return on its capital as actually invested. Therefore, it is argued, the Commission acted arbitrarily, capriciously and unreasonably by, in effect, disallowing part of the capital embarked by its investors for this purpose without finding that its capital structure was in any way imprudent or unreasonable. The Commission relies primarily on our opinion in South Central Bell v. Louisiana Pub. Serv. Comm'n, 373 So.2d 478 (1979) in which we held, first, that the authority of the Commission to establish a rate of return for a regulated utility on the basis of a hypothetical structure had been settled in Louisiana and, second, that it would be anomalous to require the agency to find the utility's actual capital structure imprudent or unreasonable before it is allowed to disregard it and hypothesize an artificial structure in place of the real one. Ironically, however, it is the second part of that holding that now appears to have been anomalous, particularly in light of the growing utilization of the prudent investment test and recognition of its arguable constitutional dimension. Accordingly, after reconsidering the decision carefully, in light of these factors, we conclude that it was partially in error and that the Commission must find a utility's capital structure imprudent or unreasonable before disregarding it in ratemaking.
In Duquesne Light Co. v. Barasch, 488 U.S. 299, 109 S.Ct. 609, 616-7, 102 L.Ed.2d 646 (1989), Chief Justice Rehnquist succinctly set forth the history of the prudent investment or historical cost rule in the Supreme Court: "At one time, it was thought that the Constitution required rates to be set according to the actual present value of the assets employed in the public service. This method, known as the `fair value' rule, is exemplified by the decision in Smyth v. Ames, [169 U.S. 466, 18 S.Ct. 418, 42 L.Ed. 819 (1898)], supra. Under the fair value approach, a `company is entitled to ask ... a fair return upon the value of that which it employs for the public convenience,' while on the other hand, `the public is entitled to demand ... that no more be exacted from it for the use of [utility property] than the services rendered by it are reasonably worth.' Id., 169 U.S. at 547, 18 S.Ct. at 434. In theory the Smyth v. Ames fair value standard mimics the operation of the competitive market. To the extent utilities' investments in plants are good ones (because their benefits exceed their costs) they are rewarded with an opportunity to earn an `above-cost' return, that is, a fair return on the current *364 `market value' of this plant. To the extent utilities' investments turn out to be bad ones (such as plants that are canceled and so never used and useful to the public), the utilities suffer because the investments have no fair value and so justify no return."
"Although the fair value rule gives utilities strong incentive to manage their affairs well and to provide efficient service to the public, it suffered from practical difficulties which ultimately led to its abandonment as a constitutional requirement. In response to these problems, Justice Brandeis had advocated an alternative approach as the constitutional minimum, what has become known as the `prudent investment' or `historical cost' rule. He accepted the Smyth v. Ames eminent domain analogy, but concluded that what was `taken' by public utility regulation is not specific physical assets that are to be individually valued, but the capital prudently devoted to the public utility enterprise by the utilities' owner. Missouri ex rel. Southwestern Bell Telephone Co. v. Public Service Comm'n, 262 U.S. 276, 291, 43 S.Ct. 544, 547-548, 67 L.Ed. 981 (1923). Under the prudent investment rule, the utility is compensated for all prudent investments at their actual cost when made (their `historical' cost), irrespective of whether individual investments are deemed necessary or beneficial in hindsight. The utilities incur fewer risks, but are limited to a standard rate of return on the actual amount of money reasonably invested."
"Forty-five years ago in the landmark case of Federal Power Comm'n v. Hope Natural Gas Company, 320 U.S. 591, 64 S.Ct. 281, 88 L.Ed. 333 (1944), this Court abandoned the rule of Smyth v. Ames, and held that the `fair value' rule is not the only constitutionally acceptable method of fixing utility rates. In Hope we ruled that historical cost was a valid basis on which to calculate utility compensation. 320 U.S., at 605, 64 S.Ct. at 289. (`Rates which enable [a] company to operate successfully, to maintain its financial integrity, to attract capital, and to compensate its investors for the risk assumed certainly cannot be condemned as invalid, even though they might produce only a meager return on the so called `fair value' rate base')."
In Duquesne the court held that a state scheme of utility regulation does not take the utility's property in violation of the Fifth and Fourteenth Amendments simply because it requires the state regulatory commission to disallow in rate making prudent capital investments that are not used and useful in service to the public. The complaining utilities did not attempt to show that the overall rate produced an end result that was confiscatory. The opinion's extensive elaboration on the prudent investment or historical cost rule, of which the state's scheme was a "slightly modified" form, strongly reaffirmed the rule as a valid basis on which to fix utility rates. But the court again declined to adopt a single rule as the exclusive theory of valuation as a constitutional requirement, remaining consistent with the view the court had taken since FPC v. Hope Natural Gas Co., 320 U.S. 591, 64 S.Ct. 281, 88 L.Ed. 333 (1944) ("[I]t is not theory but the impact of the rate order which counts." Id. at 602, 64 S.Ct. at 288.).
This leaves open the question of whether "prudent investment", which need not be taken into account as such in ratemaking formulas, may nevertheless need to be taken into account in assessing the constitutionality of the particular consequences produced by those formulas. "We cannot determine whether the payments a utility has been allowed to collect constitute a fair return on investment, and thus whether the government's action is confiscatory, unless we agree upon what the relevant "investment" is. For that purpose, all prudently incurred investment may well have to be counted. As the Court's opinion describes, that question is not presented in the present suit, which challenges techniques rather than consequences." Duquesne Light Co., 109 S.Ct. at 620 (Scalia, J., joined by Justices White and O'Connor, concurring.)
Moreover, the Supreme Court indicated that the misuse or inconsistent use of a crucial rate making method, such as the prudent investment rule, even without a *365 showing of confiscatoriness by the utility, may amount to a denial of due process. "Admittedly, the impact of certain rates can only be evaluated in the context of the system under which they are imposed. * * * Consequently, a State's decision to arbitrarily switch back and forth between methodologies in a way which required investors to bear the risk of bad investments at some times while denying them the benefits of good investments at others would raise serious constitutional questions." Duquesne Light Co., 109 S.Ct. at 619.
We need not consider the question of confiscation or any other federal or state constitutional issue that may be raised by the Commission's use of the prudent investment or original cost methodology. In the present civil case, this court's jurisdiction extends to both law and facts. La. Const. Art. V, § 5(C). United Gas Pipeline Co. v. Louisiana Pub. Serv. Comm'n, 241 La. 687, 130 So.2d 652 (1961); Southern Bell Tel. Co. v. Louisiana Pub. Serv. Comm'n, 239 La. 175, 118 So.2d 372 (La.1960); Vicksburg, S & P Ry. Co. v. Railroad Comm'n of Louisiana, 132 La. 193, 61 So. 199 (1913). It is sufficient to consider the case only under the self-imposed limited judicial review standard that this court has adopted in Public Service Commission cases. Accordingly we will determine whether the Commission's action was arbitrary, unreasonable, capricious or not based correctly on the law and supported by the evidence. Gulf States Utilities v. Louisiana Pub. Serv. Comm'n, 578 So.2d 71 (La.1991); South Central Bell v. Louisiana Pub. Serv. Comm'n, 352 So.2d 964, 968 (La.1977).
The Public Service Commission reports that the prudent investment or original cost rule is its method of valuation of a utility's rate base. J. Bonbright, Principles of Public Utility Rates, 230 (1961), citing National Association of Regulatory Utility Commissioners, 1984 Annual Report on Utility and Carrier Regulation (Washington, D.C., 1985), pp. 446 and 829. Since 1932, La.R.S. 45:1176 has authorized the Commission in fixing rates to disallow any unreasonable charge or expense based on a proper finding after a hearing. In CLECO v. Louisiana Pub. Serv. Comm'n, 373 So.2d 123 (La.1979), this court held that the Commission has the power to disallow for ratemaking purposes any unreasonable or unjust operating expense paid by a utility, but "[b]efore the regulatory body can make this type of adjustment, however, there must be warrant in the record of the rate case for a factual finding, or at least a reasonable inference, that the charges or expenses, are in fact unreasonable." Id. at 127.
Recently, the Commission vigorously embraced and applied the prudent investment rule by finding that an electric utility's decision to continue a nuclear power plant construction project had been imprudent and by disallowing $1.4 billion of the utility's investment as part of its rate base. This court observed that the finding and disallowance were based on 40 days of hearings and voluminous evidence and upheld the Commission's action as not having been arbitrary, capricious or unreasonable. Gulf States Utilities v. Louisiana Pub. Serv. Comm'n, 578 So.2d 71 (La.1991).
Explaining the prudent investment rule as approved for use by the Commission, this court said: "The prudent investment standard was articulated in Justice Brandeis' seminal dissent in Southwestern Bell Telephone Co. v. Public Service Comm'n, 262 U.S. 276, 43 S.Ct. 544, 67 L.Ed. 981 (1923). Although the standard has been used by regulators to a much greater extent in the years following 1974, particularly in evaluating nuclear power plants, the concept has been long established in Louisiana jurisprudence, see Morehouse National Gas Co. v. Louisiana Public Service Comm'n, 245 La. 983, 162 So.2d 334 (1964), as well as in other jurisdictions. See, e.g., In re Consolidated Edison Co., 73 P.U.R.3d 417 (N.Y.Pub.Serv.Comm'n 1968); Waukesha Gas & Elec. Co. v. Railroad Comm'n, 181 Wis. 281, 194 N.W. 846 (1923). * * * Further, under the prudent investment rule, a utility is compensated for all prudent investments at their cost when made, irrespective of whether they are deemed necessary or beneficial in hindsight. Duquesne Light Co. v. Barasch, *366 488 U.S. 299, 109 S.Ct. 609, 102 L.Ed.2d 646 (1989). That is, the focus in a prudence inquiry is not whether a decision produced a favorable or unfavorable result, but rather, whether the process leading to the decision was a logical one, and whether the utility company reasonably relied on information and planning techniques known or knowable at the time. Metzenbaum v. Columbia Gas Transmission Corp., Opinion No. 25, 4 FERC 161,277. Although a prudence review is necessarily retrospective in that it involves an examination of past circumstances, past information available, and past decisions, these factors may not be evaluated in light of subsequent knowledge." Gulf States Utilities v. Louisiana Pub. Serv. Comm'n, 578 So.2d 71, 84-85 (1991).
Applying the foregoing precepts, in light of the Commission's theory and practice in this case and others, we conclude that the Commission acted arbitrarily, capriciously and unreasonably in its refusal to accord the utility its due under the prudent investment rule. Under that principle, South Central Bell is entitled to be compensated for all prudent investments at their actual cost when made (their "historical" cost) irrespective of whether individual investments are deemed necessary or beneficial in hindsight. Duquesne Light Co., 109 S.Ct. at 616; and the utility is entitled to the presumption that the investments were prudent, unless the contrary is shown. Missouri ex rel, 262 U.S. at 289, n. 1, 43 S.Ct. at 547, n. 1. Evidently, the Commission correctly applies the prudent investment or original cost rule in valuating or disallowing the utility's investments to establish the rate base, thus limiting the utility to a standard rate of return on the actual amount of money prudently invested, rather than allowing it a fair return on the present value of that which it employs for the public convenience. On the other hand, the Commission did not adhere to the prudent investment rule when it would have worked to the utility's benefit in estimating the cost of capital. Without finding that the utility's capital investments were imprudent or that the capital structure resulting therefrom was unreasonable, the Commission disqualified the capital as actually invested and structured. Applying hindsight the Commission hypothesized the composition of a theoretical capital investment and structure for the utility. Because the hypothetical capital as theoretically structured would cost less, the Commission used this cost of capital in ratemaking, thereby reducing the revenue to be returned on the company's capital investment by some $9 million per year. Thus, by applying the prudent investment rule to valuate property and assets for the rate base but not to appraise the cost of capital, the Commission switched back and forth between methodologies in a way that deprived investors of any benefit of appreciation in their property value while penalizing them for having a prudent, rather than a theoretically optimal, capital structure. Insofar as we are aware, the Commission now follows the consistent practice of making a finding of imprudence based on adequate evidence after a hearing before disallowing the inclusion of an asset or investment in a utility's rate base. Because, as Justice Brandeis observed, there is no essential difference between a capital charge and an operating expense, as a cost of supplying the service that must be met from the revenue requirement, the Commission's failure to apply the rule equally to both types of costs or investments was arbitrary and unjustified.
Besides, the prudent investment rule is now emerging as one of the constitutional touchstones for determining whether the payments a utility is allowed to collect constitute a fair return on investment. Consequently, a regulatory commission that does not take into account all prudently incurred investment has acted arbitrarily.
The value of adhering to the precedent of South Central Bell v. Louisiana Pub. Serv. Comm'n, 373 So.2d 478 (La.1979), viz., that it is not "incumbent on the commission to find the company's actual capital structure unreasonable before it could set a rate of return on the basis of a hypothetical structure", Id. at 483, is overshadowed by the injustice and arbitrariness that it engenders. Moreover, the persuasiveness of *367 that part of the holding of the case is diminished by intrinsic problems.
In the 1979 South Central Bell case, this court correctly observed that it had previously approved the Commission's use of hypothetical capital structures in ratemaking. But the court overlooked the fact that it had never before actually decided the question of whether the Commission could disregard a utility's capital structure in estimating its cost of capital without first finding that the capitalization had been based on imprudent investments or lack of due care for ratepayers' interest. In each of the two cases relied on by the 1979 SCB rate case in its holding the debt ratio was obviously unreasonably low and arguably reflected imprudence on its face. South Central Bell v. Louisiana Pub. Serv. Comm'n, 239 La. 175, 118 So.2d 372 (La. 1960) (24.7% debt/74.6% common stock) and South Central Bell v. Louisiana Pub. Serv. Comm'n, 232 La. 446, 94 So.2d 431 (La.1957) (22.3% debt/74.6% common stock). Moreover, the opinions in those cases did not discuss or rule out the possibility that the Commission actually had found that the utility had been imprudent in its investments based on evidence in the record.
More important, in South Central Bell v. Louisiana Pub. Serv. Comm'n, 373 So.2d 478 (La.1979) this court evidently was not aware that the prudent investment standard had become an integral part of the Commission's methodology to the extent that the Commission's refusal to apply the rule to a utility's actual capital investment, while applying it to other types of investments, constituted an arbitrary switching between methodologies to the unfair disadvantage of the utility. Also, this court failed to take into account and discuss the cogent reasoning of courts in several other jurisdictions that expressly required that a regulatory commission make a finding of some type of imprudence or unreasonableness prior to choosing a hypothetical structure rather than a utility's actual capitalization.
In Mystic Valley Gas Co. v. Department of Pub. Utilities, 359 Mass. 420, 269 N.E.2d 233 (1971), the Supreme Judicial Court of Massachusetts held that although the department would not have been bound to follow the management decision if that decision had been shown to be "plainly unreasonable", the record did not show any departure from a reasonable capital structure. Therefore, the court did not perceive any justification for substituting a hypothetical capital structure for Mystic's actual capital structure. The Idaho Supreme Court decided in Boise Water Corp. v. Idaho Pub. Util. Comm'n, 97 Idaho 832, 555 P.2d 163 (1976) that the commission must accept for ratemaking purposes the actual capital structure of the utility unless it finds, on the basis of substantial evidence, that the structure is unreasonably constructed, citing e.g., New England Tel. and Tel. Co. v. Department of Pub. Utilities, 360 Mass. 443, 275 N.E.2d 493. In Southern Bell Tel. & Tel. v. Mississippi Pub. Serv. Comm'n., 237 Miss. 157, 113 So.2d 622 (1959), the Mississippi Supreme Court allowed the commission, after finding that the capital structure of the company was "imprudent and uneconomical", to adopt a hypothetical capital structure for ratemaking. The Supreme Court of Colorado in Peoples Natural Gas Co. v. Public Util. Comm'n, 193 Colo. 421, 567 P.2d 377 (1977) agreed with these authorities that "a utility regulatory authority cannot base rates on a hypothetical rather than the actual capital structure of a utility unless `existing capital structures of regulated companies ... so unreasonably and substantially vary from usual practice as to impose an unfair burden on the consumer.' " Id. 567 P.2d at 380. See also Alabama Pub. Serv. Comm'n v. Southern Bell Tel. Co., 253 Ala. 1, 42 So.2d 655 (1949); City of Lynchburg, et al v. Chesapeake and Potomac Tel. Co. of Virginia, 200 Va. 706, 107 S.E.2d 462 (Va.1959) ("It is only when it is made clear by the evidence that the officers and directors are following a policy in this regard which unreasonably favors the stockholders at the expense of the consumers that the rate-making tribunal should substitute a capital structure radically different from one fashioned *368 by the officers and directors of the corporation.")
Nor did this court take into account in the 1979 SCB rate case that the use of a hypothetical capital structure had been adversely criticized by respected ratemaking commentators, such as Bonbright, Principles of Utility Rates 234-244. He referred to the use of a hypothetical structure as substituting "an estimate of what the capital cost would be under nonexisting conditions for what it actually is or will soon be under prevailing conditions." He recognized, however, that "if the existing security structure is clearly unsound or * * * extravagantly conservative, the rate must be modified in the public interest," in which event "[a]ctual cost of capital may * * * disqualified in favor of legitimate cost." See also Phillips, Economics of Regulation, 282-283; Garfield & Lovejoy, Public Utility Economics, 128-131.
The better reasoned decisions in other jurisdictions subsequent to 1979, the year of South Central Bell v. Louisiana Pub. Serv. Comm'n, 373 So.2d 478 (La.1979), have adopted a rule similar to that advocated by the Massachusetts, Mississippi, Idaho, Colorado, Virginia and Alabama courts and the commentators. For example, in Turpen v. Oklahoma Corp. Comm'n, 769 P.2d 1309 (Okla.1988) the Supreme Court held that "[s]ince good faith is presumed on the part of public utility managers, their judgment about prudent outlays, including outlays for capital, should not be overruled unless inefficiency or improvidence on their part is shown", Id. at 1330, and approved the commission's decision not to overrule the judgment of the utility managers and impute a hypothetical debt-equity ratio. See also Continental Tel. Co. v. Alabama Pub. Serv. Comm'n, 427 So.2d 981 (Ala. 1982), citing Continental Tel. Co. v. Alabama Pub. Serv. Comm'n, 376 So.2d 1358, 1365 (Ala.1979) ("It is also incorrect to arbitrarily disregard capital ratios absent some showing in the record that the ratios are temporarily distorted, deliberately misstated, or otherwise unreliable.")
For the foregoing reasons, under the circumstances of this case, there having been no finding by the Commission that the actual capital structure of the utility resulted from unreasonable or imprudent investments, South Central Bell is entitled to have its rates fixed on the basis of its actual cost of capital under its existing capital structure. The Commission, upon remand of the case to it, is to reconsider, in the light of this opinion, the portions of its decisions relating to South Central Bell's appropriate capital structure and cost of capital for rate-making purposes, and to make any amendment to its rate order called for.

Conclusion
We see no other error of reversible merit in the district court judgment. We agree with the conclusions but not necessarily the reasons of the district court in rejecting South Central Bell's complaint that it was deprived of a neutral decision maker because the Commission's special counsel performed both as trial attorney and adviser to the Commissioners. The record reflects that the utility did not make a contemporaneous objection to the appointment of special counsel or to his performance in the manner that special counsel traditionally have in the past. Therefore, it would not be equitable, be just or serve the public interest to permit the utility to wait, "with an anchor to windward," cf. La.C.Cr.P. art. 841, comment a, to urge this alleged defect or irregularity in the rate proceeding for the first time on appeal after the rate order had been issued. Such an objection might have been entertained more propitiously, however, had it been raised with the appointment of special counsel or the advent of the rate proceedings.
For the reasons assigned, we amend the district court judgment to reverse the rate decrease order and to remand the case to the Commission for a new rate order after reconsidering, in light of this opinion, the portions of the Commission's decision relating to the utility's capital structure and cost of capital for rate-making purposes. Otherwise, the district court judgment is affirmed.
AMENDED AND AFFIRMED.
*369 CALOGERO, C.J., concurs in that part of the opinion reversing the rate decrease order, but dissents from that part relative to the utility's capital structure and reversing this Court's opinion in So. Central Bell Tel. v. LPSC, 373 So.2d 478 (La.1979).
WATSON, J., joins in the opinion but adds that he shares some of the due process concerns expressed by COLE, J.
COLE, J., concurs to assign additional reasons.
COLE, Justice, concurring and assigning additional reasons.
I agree with the majority opinion on its resolution of the principal issues, to wit: that the Commission's order requiring the utility to refund to its customers all revenues over and above the new rate level collected during the rate investigation and proceeding constituted prohibited retroactive ratemaking; and, that the Commission acted arbitrarily, capriciously, and unreasonably by disregarding the utility's actual capital structure and using a hypothetical capital structure for ratemaking purposes without first finding that the actual structure was the product of unreasonable or imprudent investments. I disagree, however, with the majority's decision to employ the contemporaneous objection rule to bar summarily South Central Bell's complaint that it was deprived of a neutral decision-maker because the Commission's special counsel performed both as trial attorney and adviser to the Commissioners.
I can envision no greater mockery of the fundamental notion of constitutional due process than to have one's opponent, or one's opponent's "special counsel" doff his advocate's hat, stride to the other side of the bench, and "assist" the decision-maker to reach the decision. "In the civil area, the [Supreme] Court [of the United States] has said that `[w]e do not presume acquiescence in the loss of fundamental rights[.]'" Fuentes v. Shevin, 407 U.S. 67, 94 n. 31, 92 S.Ct. 1983, 2001 n. 31, 32 L.Ed.2d 556 (1972) (quoting Ohio Bell Tel. Co. v. Public Utilities Comm'n, 301 U.S. 292, 307, 57 S.Ct. 724, 731, 81 L.Ed. 1093 (1937)). "Indeed, in the civil no less than the criminal area, `courts indulge every reasonable presumption against waiver.'" Fuentes, 407 U.S. at 94 n. 31, 92 S.Ct. 2001 n. 31 (quoting Aetna Ins. Co. v. Kennedy, 301 U.S. 389, 393, 57 S.Ct. 809, 812, 81 L.Ed. 1177 (1937)). As a general proposition, constructive consent is not a doctrine commonly associated with the surrender of constitutional rights. Cf. Edelman v. Jordan, 415 U.S. 651, 673, 94 S.Ct. 1347, 1360, 39 L.Ed.2d 662 (1974) (state's constructive consent to suit in federal court).
This Court has held, time and again, that the contemporaneous objection rule is not absolute, and exceptions exist which allow errors to be raised despite the lack of objection at trial.[1] The Court has said that the contemporaneous objection rule is inapplicable when the objection would have been a "vain and useless act." State v. Ervin, 340 So.2d 1379, 1381 (La.1976). The majority notes "the utility did not make a contemporaneous objection to the appointment of special counsel or to his performance in the manner that special counsel traditionally have in the past." Supra, at 368 (emphasis supplied). Given this tradition of blending advocacy and decision-making functions, and its tacit acceptance by this Court, it would most assuredly have been a vain and useless act for South Central Bell to have objected during the Commission proceeding.
It is important to emphasize the majority does not decide whether South Central Bell was accorded due process. Rather, acknowledging "[s]uch an objection might have been entertained more propitiously... had it been raised" earlier in the proceedings, the Court declines to resolve the issue. Supra, at 368. I would not deem the due process issue waived, since objecting would have been a vain and useless act, and I would hold the intermingling, by special counsel, of the advocacy and decision-making *370 functions denied South Central Bell due process of law. See Allen v. State Board of Dentistry, 543 So.2d 908, 914-16 (La.1989) (idea of same person serving as judge and prosecutor is anathema under our notions of due process).
CALOGERO, Chief Justice, concurring in part and dissenting in part with reasons.
I concur in that part of the opinion reversing the rate decrease order, but disagree with the majority relative to the utility's capital structure issue and reversal of this court's opinion in South Central Bell Telephone Co. v. Louisiana Public Service Commission, 373 So.2d 478 (La.1979). This court has consistently held that the Public Service Commission has wide discretion in regulating the utility and is not bound to determine that the utility company's capital structure is unreasonable before employing another, hypothetical capital structure to fix a rate of return for the utility that is more favorable to ratepayers while still maintaining the ability of the utility to fund its operations in an efficient and safe manner. See South Central Bell Telephone Co. v. Louisiana Public Service Commission, 373 So.2d 478 (La.1979); South Central Bell Telephone Co. v. Louisiana Public Service Commission, 239 La. 175, 118 So.2d 372 (1960); South Central Bell Telephone Co. v. Louisiana Public Service Commission, 232 La. 446, 94 So.2d 431 (1957).
The jurisprudence in this state has uniformly recognized and approved the wide discretion accorded the Commission as a quasi-legislative body with constitutionally-derived authority. In the context of this dispute, the Commission's role is to protect the ratepayers from having to fund the utility's choice of capital structure that affords it a luxurious, rather than simply efficient, manner of operating. In this court's words, the Commission is "authorized to fix `just and reasonable' rates for public utilities." 373 So.2d at 482. There has never been mention of any requirement that the Commission make a finding of a utility's imprudent investments prior to fixing these just and reasonable rates as the Commission is not only authorized, but mandated to do.
This court noted in the 1979 decision that the majority now overrules that "the Commission has a duty to ensure that ratepayers are not penalized by management's decision to maintain a low debt ratio." 373 So.2d at 484. Quoting the 1960 opinion, the court explained that "we recognized the Commission's authority to regulate the industry as an efficient enterprise, rather than as a luxurious one, to ensure its subscribers service at the lowest rates which `enable a utility to operate successfully, to maintain its financial integrity, to attract capital, and to compensate its investors for the risks assumed.'" Id. (quoting the 1960 opinion 118 So.2d at 381). Is it not unreasonable for the utility to continue its upward adjustment of the percentage of equity at the ratepayers' expense (especially if SCB could just as well fund their operations with debt at a lower interest rate than the court required to satisfy preferred or common stockholders expectations of dividends)?
This court has always resolved the capital structure issue by stating that the Commission had "wide discretion" in regulating the utility, that "[t]he Commission is not required to accept uncritically ... the utility's corporate form...." and that it was not "incumbent on the Commission to find that company's actual capital structure unreasonable before it could set a rate of return on the basis of a hypothetical structure." 373 So.2d at 484, 483. Therefore, although perhaps this court made no specific statement regarding the Commission's right to disregard the utility's actual structure in favor of its own hypothetical structure which would allow the utility to operate efficiently, not luxuriously, its decisions spoke louder than words: the Commission's determinations were routinely upheld with the rationales as stated above.
The appropriate inquiry in analyzing the capital structure is whether it is efficient and safe. The 1979 holding approved a regulatory adjustment to the capital structure based on testimony that the actual capital structure "was too expensive and *371 was unnecessary to provide the company with adequate safeguards against adverse financial conditions." Id. at 482.
The standard of review was enunciated in the 1979 decision. It is as follows:
The Louisiana Public Service Commission is authorized to fix "just and reasonable" rates for public utilities. Orders of the Commission are entitled to great weight and should not be overturned unless they are shown to be arbitrary, capricious or abusive of the Commission's discretion. It is also well established that courts should be hesitant to substitute their views for those of the expert body performing the legislative function of setting rates, and should not disturb the Commission's decision without a clear showing of an abuse.
In this case, the Commission determined that SCB's actual capital structure was unduly expensive and that the 50%-50% ratio would ensure that the company remains financially stable. Additionally, the Commission's decision is close to that capital structure used previously that was upheld by this court. The hypothetical structure would be safe (the expert testified that, after his analysis, he believed that the proposed ratio would definitely maintain a AA rating and probably a AAA rating). Further, the security of SCB is even greater because it finances its construction program with internally generated funds, thus does not have to attract capital on the open market.
The Commission adopted a capital structure higher (i.e., more favorable to SCB) than that recommended by its expert. As in the 1979 case, the Commission utilized a capital structure very similar to that employed in the last rate case. In 1984, the Commission used a capital structure containing 49% equity. In this case, the Commission employed a 50% equity capital structure which is more favorable to SCB. Thus, the only change was to increase the equity ratio allowed the company.
I think that overruling this line of jurisprudence portends dangerous consequences for the ratepayers of the state as it essentially gives the utilities the option of employing any capital structure as long as the investments are not actually imprudent. That position of choosing the most advantageous capital structure does not ensure that the utilities are managing the companies in the most efficient manner in order to keep the rates as low as possible.
NOTES
[1] That the present proceeding is not technically a "trial" does not diminish the importance of the requirement of a fair hearing.