689 So.2d 1337 (1997)
GULF STATES UTILITIES COMPANY
v.
LOUISIANA PUBLIC SERVICE COMMISSION.
No. 96-2046.
Supreme Court of Louisiana.
February 25, 1997.
*1339 L. Richard Westerburg, Jr., Baton Rouge, J. Wayne Anderson, Margot Gallup Augustin, Stephen Thomas Perrien, Kimberly H. Despeaux, Kathryn J. Lichtenberg, New Orleans, for Applicant.
Laurie A. Barcelona, New Orleans, Brian Andrew Eddington, Baton Rouge, Michael R. Fontham, Wayne Lee, New Orleans, for Respondent.
CALOGERO, Chief Justice.[*]
This is a direct appeal by Gulf States Utility Company from a district court judgment which affirmed the Louisiana Public Service Commission's ordering $8.716 million in refunds to Gulf States' Louisiana-jurisdictional customers. The judgment of the district court, favoring the Commission, affirmed their Order No. U-20647 which commanded Gulf States to refund approximately $27.548 million to its Commission-jurisdictional customers. Of that amount, $13.7 million consists of a refund for overcharges from March 1, 1990 through March 31, 1994, ordered by this Court in Gulf States Utilities Co. v. Louisiana Pub. Serv. Comm., 92-CA-1185 (La.3/17/94), 633 So.2d 1258 [hereinafter NISCO]. Gulf States paid $13.1 million of that $13.7 million, but contests the remaining $600,000 [hereinafter $.6 million]. Of the other $13.848 million refund ordered, Gulf States contests $8.116 million,[1] consisting of $5.82 million in alleged fuel adjustment overcharges between October 1, 1988 and March 1, 1990, $1.85 million in imprudence disallowances, and $.446 million in interest on previously-refunded overcharges. *1340 The district court affirmed the Order, holding that Gulf States "failed to meet its hefty burden of proof and did not prove that the actions of LPSC were arbitrary, capricious or an abuse of authority." For the reasons that follow, we uphold the Commission's disallowance of $5.82 million in fuel adjustment overcharges for the period from October 1, 1988 to March 1, 1990, as well as the Commission's calculation on remand of the refund due for fuel adjustment overcharges from March 1, 1990 through March 31, 1994 at $13.7 million ($.6 million of which is contested by Gulf States). We further uphold the $1.85 million in imprudence disallowances assessed by the Commission. We reverse the Commission as to its order of $.446 million in interest on past refunds.

Background
In NISCO, this Court held that Gulf States had improperly obtained a double recovery of its investment in two gas-fired generation units that had been built in 1959 at a cost of $38 million. Of that $38 million investment, Gulf States had recovered approximately $29 million from its ratepayers through base rates by the year 1986, leaving a depreciated book value of approximately $9 million. In 1986, Gulf States sold the units to the Nelson Industrial Steam Co. ("NISCO") for a price that required payment by NISCO (and the receipt by Gulf States) of $127 million, $6.35 million per year over 20 years.
NISCO is a joint venture created in 1986 between Gulf States and three of its industrial customers. Pursuant to the joint venture agreement, Gulf States would still operate the units and be compensated therefor; NISCO would buy the steam and Gulf States the electricity which the units were to produce. The primary advantage to Gulf States in that transaction, aside from keeping the industrial customers' load on the Gulf States system, was that the units were to be converted, solely at the expense of the industrial participants, from the use of natural gas into a "fluidized bed combustion plant capable of burning certain solid fuels, particularly petroleum coke which was abundantly available in the area." NISCO, 633 So.2d at 1260. Fuel costs, and thus overall capacity costs, would thereby be lower as a result of the conversion. Though the costs of the conversion were borne entirely by the three industrial partners, Gulf States was nevertheless granted 1% ownership in the converted units.
In return for that 1% equity ownership in the units, Gulf States obligated itself to purchase the electricity produced by the same two units, using the electricity to serve Gulf States' customers (including the three industrial participants). The price to be paid for the electricity by Gulf States to NISCO included an annual "asset fee," by which Gulf States reimbursed NISCO for the amount NISCO paid to purchase the units. Pursuant to a complex pricing agreement, the cost of the electricity purchased by Gulf States from the NISCO partnership, including the "asset fee" paid by Gulf States to NISCO, was charged to ratepayers through Gulf States' fuel adjustment clause. So Gulf States' receipt of $6.35 million for each of 20 years (largely from the sale of the two units), coupled with their already having depreciated all but approximately $9 million of the $38 million cost of the two gas-fired generating units, represented a double recovery. In other words, Gulf States' ratepayers did not receive that portion of the $6.35 million per year representing Gulf States' gain on the transaction.[2]
Upon application by Gulf States, as required by Commission Order No. U-14964,[3] *1341 the Commission unanimously approved the NISCO contract in 1987 by Order No. U-17414, because it sought to avoid a rate increase for Gulf States' customers that would inevitably have resulted from the loss of the industrial partners' load on Gulf States' system, and because the contract allowed Gulf States to enjoy new technology and consequent lower capacity costs using low cost, locally-abundant fuel without having to bear any of the costs of the units' conversion to coke.
However, in a later, independent ratemaking proceeding prompted by Gulf States' request for a rate increase for expenses associated with a facility unrelated to the NISCO units,[4] the Commission determined that the NISCO transaction provided Gulf States with an impermissible double recovery of its investment in the two generators. According to the Commission, Gulf States impermissibly recovered its investment twice by charging to its ratepayers, through the fuel adjustment clause, the $6.35 million so-called "asset fee" [remember that this "asset fee" represents an annual reimbursement to the NISCO partnership of the annual amount it was to pay to purchase the units], after the ratepayers had already paid all but approximately $9 million of the units' depreciation through the base rates by the year 1986. By Order No. U-17282-H, the Commission required that the portion of the $6.35 million annual payment representing the "gain," calculated as described in footnote 2 hereinabove, received by Gulf States on the sale of the generating units be prospectively eliminated from the fuel adjustment clause in the rates charged to ratepayers. In the Order, the Commission explained its action:
The company [GSU] has recovered the vast majority of the costs associated with the Nelson units over their useful life through the inclusion of those units in rate base and recognition of the operating costs as cost of service expenses for ratemaking purposes. Gulf States is paying NISCO for all of the costs associated with the production of electricity from those plants. Included within those costs are the annual $6.35 million payments by the industrial customers to Gulf States. Therefore, although GSU is receiving payments of $6.35 million per year, its ratepayers are the ones actually absorbing that cost. Ratepayers are being penalized by this transaction. It was never the Commission's intent to have ratepayers pay more than they would have had the NISCO transaction not occurred. Yet that is precisely the result being achieved. For the foregoing reasons we find it appropriate to exclude the gain portion of the NISCO annual payments from recovery through the fuel clause.
Gulf States contends that the Commission may not preclude recovery of the payments made for the profit associated with the NISCO transaction because the Commission previously approved the accounting treatment of the salewhich included below-the-line treatment of the present value of Gulf States' gain. However, the approval of the below-the-line treatment of the gain received from NISCO is not the same as foreordaining that ratepayers must supply the funds through the fuel clause to finance the payment of a windfall, to shareholders. Ratepayers already paid once for the Nelson units through depreciation reflected in base rates; they should not be required to pay twice. Further, the fuel clause issue relating to the NISCO sale was not fully analyzed in the prior proceeding. Therefore, Gulf States will be directed not to include to [sic] gain-related payments in its fuel costs. Order No. U-17282-H at 32-33.
In NISCO, this Court agreed with the Commission and held that "[t]he Commission's approval of the contract for GSU's purchasing electricity from NISCO could not be viewed as precluding the Commission's future adjustments of the rates that GSU *1342 charged to ratepayers." 633 So.2d at 1263. We thereby upheld Order No. U-17282-H, dated March 1, 1990, which required Gulf States to cease including the gain in the fuel adjustment clause from that date, and to refund any amounts representing the gain that had been charged to ratepayers in the period being investigated by the Commission. We remanded to the Commission for calculation of the amount of the refund. On remand, the Commission calculated the overcharged amounts, including interest through May 31, 1994, at $13.7 million. By Order No. U-20647, the Commission required Gulf States to refund that amount, along with an additional, but separate, $13.85 million consisting of various other alleged overcharges, some of which are at issue in this appeal.[5]
Hereafter in this opinion we will treat successively the matters which are in dispute in this appeal: (1) the Commission's calculation of the refund due on remand pursuant to the NISCO decision, in the amount of $13.7 million ($.6 million of which is contested by Gulf States); (2) the retroactive disallowance of $5.82 million in NISCO charges passed through the fuel clause between October, 1988 and March 1, 1990; (3) disallowances in the amount of $1.85 million in purchased-power costs stemming from imprudent power outages at Gulf States' River Bend nuclear facility; and (4) the Commission's order to refund $.446 million in interest on certain past refunds passed through its fuel adjustment clause at a time when the fuel adjustment mechanism did not allow for the possibility of interest recovery.

I. Calculation of Refund on Remand
Of the $13.7 million refund ordered to be paid, Gulf States paid $13.1 million. In the district court and again here, Gulf States contests the Commission's calculation of the remaining $.6 million, claiming that Order No. U-20647 improperly denies recovery of the full amount of expenses Gulf States incurred to accomplish the NISCO transaction, and also that the Order denies Gulf States any recovery of its investment in certain facilities transferred to NISCO in 1992. Our review of the record indicates that Gulf States' arguments are without merit.
At the hearings for Order No. U-20647, experts for both sides testified as to the proper amount of the refund by virtue of Order No. U-17282-H. The Commission's expert calculated the overcollection for the period being reviewed (March 1, 1990 through May, 1994) at $11,348,000; with interest his recommended refund was $14,636,000. Gulf States' expert calculated the overcollection during the same period at $10,207,334 and the total refund, with interest, at $13,137,196. The difference in the recommendations (approximately $1.131 million) stemmed not from the amount of the "asset fee" paid by Gulf States to NISCO, which was undisputedly $6.35 million annually during the review period from March 1, 1990 to May 5, 1994, but rather from the amount of offsets to that fee included in each expert's calculations. The Commission ordered a refund of $13.7 million, an amount the Commission contends is calculated to ensure that ratepayers pay no more than they would have paid for the Nelson units and the common facilities had the NISCO transaction not occurred.
The Commission allowed Gulf States a setoff for the pro rata portions of the depreciation that had not been paid for by ratepayers through the base rates at the time of the sale in 1986 (approximately $9 million out of the original $38 million cost of construction). The Commission contends that it also partially setoff the expenses of the NISCO transaction by allowing their full recovery but denying Gulf States' shareholders any rate of return on them. The Commission wrote:
The expense incurred by Gulf States in connection with the transaction is a different story. If the sale had never occurred, ratepayers would not have been required to pay the expense. Nevertheless, an argument can be made that Gulf States should be entitled to some recovery of the expense, since the NISCO transaction was assertedly undertaken partly for the ratepayers' benefit. The transaction also was undertaken to benefit shareholders, however, and they should bear a fair proportion *1343 of the cost. Mr. Kollen's methodology of allowing a recovery of, but not on, the expense will be used for this category of cost, as it fairly apportions the cost between the company and the shareholders. Order No. U-20647 at 21 (emphasis supplied).
The Commission denied any setoff for Gulf States' investments in certain common facilities transferred to the NISCO project on January 1, 1992. The Commission denied this setoff despite the fact that experts for both sides allowed some setoff for the investment in that plant. At the time the Commission issued Order No. U-20647, the plant had not been removed from base rates because no base rate proceeding had been conducted since the January 1, 1992 transfer of the additional common facilities to non-utility plant. By Order No. U-19904-C, dated December 29, 1994, the investment was eliminated from base rates. However, because the refund at issue was calculated only through May, 1994, Order No. U-20647 at 19, an impermissible double recovery would take place if Gulf States were allowed to recover its investment in the common facilities through the fuel clause by setting it off against the gain from the NISCO transaction, when it was at the same time recovering that investment through the base rates.
Gulf States argues that the Commission's denial of any setoff for the transferred common facilities permanently forecloses recovery of its investment in those facilities, since the Commission has now disallowed that recovery through the fuel clause in addition to removing the plant from base rates. This argument is meritless. On the issue of recovery of these investment costs, the instant Commission order, No. U-20647, addresses only the time period from April, 1990 to May, 1994. During that time period, the investment was still being charged to the ratepayers through base rates. The Commission was thereby correct to deny any recovery of that same investment through the fuel clause for the same period.
However, nothing in Order No. U-20647 precludes the future recovery of any remaining unrecovered investment costs through the fuel adjustment clause. In fact, the Commission stated, "The Commission will disallow any credit against the fuel clause reduction for the common facilities transferred January 1, 1992, at least until a base rate proceeding in which these facilities are excluded from rate base. This action is necessary to avoid the requirement that ratepayers pay twice for the same plant." Order No. U-20647 at 22 (emphasis supplied). The base rate proceeding referred to by the Commission took place on December 29, 1994. Therefore, the Commission will logically not disallow any setoff, in calculating fuel recoveries, for these common facilities after December 29, 1994, the date of the plant's removal from base rates.
We find that the Commission's disallowance of any setoff for Gulf States' investment in the common facilities assigned to the NISCO project on January 1, 1992 was reasonableduring the period addressed by the refund on remand, Gulf States was already recovering its investment in those facilities through base rates. We further find that the Commission's denial to Gulf States' shareholders of any recovery on, rather than of, the expenses incurred in the NISCO transaction was reasonable. Gulf States shared in the benefits of the NISCO transaction to the extent that it gained 1% equity ownership in the two converted generation units, and because it contracted to operate the units for compensation from the NISCO partnership. Gulf States' shareholders should thereby share in the NISCO transaction expenses. The Commission's method of accomplishing that sharing, by denying any recovery on the expenses, was reasonable.
For these reasons, we find that the Commission's calculation of the NISCO refund for the period from April, 1990 through May, 1994 at $13.7 million was not "arbitrary, capricious, abusive of its authority, clearly erroneous or unsupported by the evidence." Central Louisiana Electric Co. v. Louisiana Public Service Commission, 437 So.2d 278 (La.1983); see also CTS Enterprises v. Louisiana Public Service Commission, 540 So.2d 275 (La.1989) ("[A] court will not upset the agency's finding unless it is based on an error of law or is one which the Commission could not have found reasonably from the *1344 evidence."); Louisiana Power & Light v. Louisiana Public Service Commission, 523 So.2d 850 (La.1988) (holding that the inquiry is "whether the commission acted unreasonably or arbitrarily in setting rates for the utility"). Gulf States will be ordered to refund the additional $.6 million, with interest to date, as directed by Order No. U-20647.

II. RETROACTIVE DISALLOWANCE OF FUEL ADJUSTMENT CLAUSE CHARGES
Next, Gulf States contests the portion of Order No. U-20647 which requires it to refund $5.82 million to its Commission-jurisdictional customers. That portion of the refund represents amounts Gulf States wrongly double-charged pursuant to the NISCO transaction described above, but for the earlier time period of October 1, 1988 to March 1, 1990 that was not covered by the NISCO decision.[6]NISCO reviewed the inclusion of the double charges from the period from March 1, 1990 to the date of the NISCO decision.[7] Gulf States argues that the Commission may not, within constitutional parameters, retroactively alter the charges passed through the fuel adjustment clause pursuant to its contract with NISCO. Gulf States' argument is premised on the Commission's approval of the NISCO transaction in 1987, which approval, Gulf States claims, constitutes "antecedent reasonableness review" of the recovery of these costs through the fuel clause, and which thus bars subsequent modification under the well-established rule against retroactive ratemaking. See South Cent. Bell v. Louisiana Pub. Serv. Comm., 594 So.2d 357, 359 (La.1992).[8] Gulf States concedes the Commission's authority to prospectively modify its fuel clause, authority conclusively established by the NISCO decision. Gulf States also concedes that initial approval of the fuel adjustment clause mechanism, as propounded in a base rate proceeding, does not constitute approval of the costs to be passed through that fuel adjustment clause, because those costs fluctuate on a monthly basis. Gulf States even concedes the Commission's authority to disapprove retroactively costs passed through a fuel adjustment clause, under this Court's decision in Daily Advertiser et al. v. Trans-La et al., 612 So.2d 7 (La.1993) [hereinafter Daily Advertiser.] That case held, "[T]he commission's allowance of monthly cost adjustments pursuant to such clauses does not constitute rate making in the traditional sense of that term because such adjustments go into effect without an antecedent reasonableness review and thus are not `commission-made' rates." Id. at 23. Therefore, as Gulf States recognizes, under Daily Advertiser, the Commission is not prohibited by the rule against retroactive ratemaking from subsequently adjusting costs passed through a utility's fuel adjustment clause.
Nevertheless, Gulf States disputes the existence of any authority on the part of the Commission to adjust costs under the instant facts and thereby retroactively modify the *1345 fuel adjustment clause, since the Commission has already approved the contract pursuant to which those costs were passed through the fuel adjustment clause. Gulf States makes this argument despite the clear impermissibility of the double-recovery of its investment in the Nelson units, as established in NISCO, and despite this Court's holding in NISCO that the Commission's 1987 approval of the NISCO transaction did not constitute approval of that double-recovery. In other words, in NISCO, this Court held that no "antecedent reasonableness review," within the meaning of Daily Advertiser, took place with regard to Gulf States' passing its double-recovery through the fuel adjustment clause. In the words of the Court, "GSU had to know that the commission could not expressly approve in advance the entirety of the vast and non-detailed expenditures for the project that would eventually go into the rate-making process as to GSU's customers."
Reading NISCO and Daily Advertiser together leads to the inescapable conclusion that Gulf States' argument is meritless. Daily Advertiser holds that fuel clause charges may be retroactively disallowed if they are not subjected to prior reasonableness review by the Commission, and NISCO holds that no such reasonableness review took place with regard to these particular double charges. Accordingly, we affirm that portion of Order No. U-20647 that orders the refund of $5.82 million impermissibly double-charged by Gulf States to its Commission-jurisdictional customers through its fuel adjustment clause during the period of the Phase I review not covered by the NISCO decision, October, 1988 through March 1, 1990.

III. The Imprudence Disallowances
Gulf States also contests $1.85 million in combined imprudence disallowances assessed by the Commission in Order No. U-20647.[9] The disallowances stem from four separate power outage extensions which occurred during the Phase I review period, October 1, 1988 through September, 1991, at River Bend, a $4.4 billion, 940 megawatt nuclear plant completed in 1986.[10] Gulf States argues that the outages were not the result of any imprudence on its part, and further that, even conceding imprudence arguendo, the outages caused no harm to ratepayers. Mr. Lane Kollen of Kennedy & Associates filed testimony on behalf of the Commission staff, while Gulf States submitted the testimony of several employees, each in his area of expertise and knowledge of particular events.
As an initial matter, we must address the proper standard of imprudence to be applied to a utility's actions. Gulf States proposed, through the testimony of Mr. Bruce M. Louiselle, a two-tiered standard for evaluating the prudence of River Bend's operation. The first tier would measure whether the utility's performance is above or below average, as determined by acceptable industry standards. If a utility's performance is above average, the second tier would require "a showing that an event caused by clearly imprudent action, not simply inadvertence or human error, caused an increase in fuel costs" before an imprudence disallowance would be proper. If a utility's conduct were below average, a disallowance would be proper only if it were shown that the utility did not act reasonably in the circumstances. Another Gulf States witness, Mr. Donald Derbonne, who at the time of the River Bend outages was the Assistant Plant Manager for *1346 Maintenance, proposed an imprudence standard which would require "some conscious knowledge that you're doing something wrong."
Gulf States' proposed imprudence standard does not comport with this Court's decision in Gulf States Utilities Co. v. Louisiana Public Service Commission, 578 So.2d 71 (La. 1991) [hereinafter Gulf States I], where we explained the prudent investment standard as follows:
That standard `essentially applies an analog of the common law negligence standard for determining whether to exclude value from rate base.' That is, the utility must demonstrate that it `went through a reasonable decision making process to arrive at a course of action and, given the facts as they were or should have been known at the time, responded in a reasonable manner.' 578 So.2d at 84-85 [citations omitted].
In that opinion, we made no mention of differing performance standards based on an initial determination of whether the utility's performance is above or below average according to industry standards, nor did we intend that a standard other than reasonableness under the circumstances be applied to the actions of a utility in deciding whether a disallowance should be assessed. Further, it would be nonsensical to require "some conscious knowledge" of wrongdoing for a finding of imprudence in light of the purpose of imprudence disallowances, which is to act as a substitute for market competition, as outlined in footnote 9 supra. Just as conscious knowledge of its wrongdoing is not always what causes a customer in a competitive market to take his business away from an imprudent, and therefore inefficient, company, and give it to an efficiently operating company, neither should conscious knowledge of wrongdoing be a determining factor in deciding whether an imprudence disallowance should be assessed against a utility. Because ratepayers have only one power supplier, they are dependent on that supplier's management to make reasonable attempts to minimize costs through prudent decisionmaking. Therefore, the proper standard for determining whether a utility was imprudent is whether objectively that utility acted reasonably under the circumstances, because only the utility, and not the ratepayer, is in a position to minimize imprudence and maximize efficiency. A finding of unreasonableness, and therefore imprudence, by the Commission, will be upheld unless it is "based on an error of law or is one which the Commission could not have found reasonably from the evidence." CTS Enterprises, 540 So.2d 275.
In this case, the Commission found that Gulf States' imprudence caused four different delays, of varying lengths, in two planned "refueling outages." Like other nuclear power plants, River Bend must schedule outages to replace spent fuel. During refueling outages, the utility conducts maintenance, inspections and testing that cannot safely be performed while the nuclear reactor is in operation. Since it is planned and scheduled in advance, a refueling outage is considered a "planned outage." In contrast, a "forced outage" occurs when the unit shuts down automatically or manually in response to unplanned problems such as system failures, equipment failures, or an incident such as a fire or explosion.
When River Bend suffers an outage, either forced or planned, Gulf States' customers must be supplied with electricity from other sources, either from less efficient facilities on the system (to be described infra) or with power purchased from other utilities. In Order No. U-20647 at 39-40, the Commission outlined the specifics of a nuclear plant planned outage:
In planning a refueling outage, the River Bend outage managers establish a critical path schedule. The various departments identify the tasks that must be performed during the outage. Since all tasks cannot be performed at the same time, and some tasks must be completed before others can be started, the outage management group must align the tasks in the sequence that will result in the completion of all of the tasks in the shortest time. The "critical path" then is the schedule of specific tasks that determines the potential duration of the outage. While other work items may be performed in parallel with *1347 the critical path items, the critical path items are those that must be completed before the next sequence or phase of necessary projects can be started. As a result, if an item on the critical path takes longer to complete than planned, there may be an extension of the outage. If completion of a "non-critical path" item is delayed, it can become the critical path by delaying activities on the critical path.
The critical paths of River Bend's Refueling Outage Two (RFO-2) and Refueling Outage Three (RFO-3) were delayed on four separate occasions at issue herein. The Commission determined that those delays were the result of imprudence on the part of Gulf States, and thus disallowed $1.85 million in purchased power costs incurred during those delays. The Commission found Gulf States imprudent in causing: (1) eleven days of critical-path delay resulting from the negligent repair of a diesel generator during RFO-2; (2) sixteen days of critical-path delay due to the explosion of its "B Preferred Transformer" during RFO-2; (3) sixty-four total hours of outage from the installation of improper "O"-rings in its Electro-Hydraulic Control system during RFO-2; and (4) two days of delay related to a fire in a diesel generator during RFO-3.[11] After reviewing the record, we determine that the Commission's imprudence disallowances were not arbitrary or capricious, but were rather fully supported by the evidence. The specifics of the four outages, and our reasons for upholding the Commission's disallowances therefrom, are fully set out in an unpublished appendix to this opinion.
Having determined that all four of the imprudence disallowances assessed against Gulf States were proper, we now turn to Gulf States' unique position that, even conceding its imprudence arguendo, it should not have to return any amounts to its ratepayers because the ratepayers actually pay less when River Bend does not run. This "no harm, no foul" argument[12] is premised on the unusual posture of the Louisiana-jurisdictional portion of River Bend, described below.
On December 15, 1987, after forty days of hearings before a Hearing Examiner, the Commission issued an order finding that Gulf States' investment in River Bend was imprudent. Based on its consultants' estimates of the cost of the alternatives that had been available to Gulf States, the Commission disallowed, as imprudent, $1.4 billion of Gulf States' $3 billion investment and excluded the Louisiana share of that amount, approximately $677 million (approximately $723 million was the Texas share) from the company's Louisiana rate base. That disallowance was affirmed by this Court in Gulf States I.
However, the company was not forced to write-off that entire $677 million. Rather, a compromise was struck between the Commission and Gulf States which largely removed the sting of the disallowance. A part of the River Bend plant's capacity equivalent to the portion of Gulf States' imprudent investment (approximately 46.6%) was excluded from the rate base and treated as a deregulated asset. By Order No. U-17282-K, the Commission promulgated this "deregulated asset plan," by which the Commission guaranteed that energy produced by the deregulated asset would be purchased by Louisiana ratepayers at the rate of 4.6 cents per kilowatt hour (kWh), while retaining the option to return the deregulated asset to the rate base at its fully depreciated cost at any time. Upon approval by the Commission, Gulf States was thereupon allowed to sell the 46.6% portion of River Bend's capacity off-system, but would have to allocate 50% of the corresponding receipts above 4.6 cents/kWh (should they ever generate such receipts) to the regulated entity to reduce rates through the operation of the fuel clause. Should the Commission disapprove of any given "off-system, non-economy sale," it retained the right to have Louisiana retail ratepayers purchase the power and energy, at the rate of 4.6 cents/kWh plus 50% of the increment *1348 above 4.6 cents/kWh offered by a third party.[13] Note, however, that Gulf States, despite having the option to sell its deregulated capacity off-system, has never done so.[14] Every kilowatt hour of its deregulated capacity has been sold to the regulated asset at the rate of 4.6 cents/kWh.
Gulf States recovers its operating costs for River Bend in two components: (1) the "regulated portion" recovers its fuel costs through fuel adjustment, and other costs through the base rates; (2) the "deregulated portion" recovers its costs only through the sale of the electricity it producesGulf States is not allowed to recover any portion of the deregulated asset's costs through base rates. Gulf States concedes that, because it recovers its costs for the deregulated capacity only when the deregulated asset operates, it bears the risk of any imprudence in the operation of the deregulated asset. In other words, because it recovers costs for that 46.6% only when it produces electricity and sells it at 4.6 cents/kWh, it recovers nothing for that 46.6% when the plant does not run, unlike the regulated portion, for which it still recovers fixed costs through base rates even when the plant is out of service.
Nevertheless, Gulf States argues that, to determine whether any imprudence disallowance is warranted in this case, the average cost of generating a kilowatt hour of capacity at River Bend should be calculated by combining the 1 cent/kWh cost of the 53.4% of its regulated capacity with the 4.6 cents/kWh cost of the 46.6% deregulated capacity. The midpoint between 1 cent and 4.6 cents is 2.8 cents, but because the 1 cent "weighs" 6.7% more than the 4.6 cents, the "merged" fuel clause cost of one kilowatt hour of capacity from River Bend stands at approximately 2.6 cents. At the time of the outages at issue, the average market cost of replacement capacity was 1.8 cents/kWh. The "merged" fuel clause cost of self-generated capacity to Gulf States ratepayers (2.6 cents/kWh) was therefore higher than the replacement cost capacity at the time of these outages (1.8 cents/kWh). Accordingly, Gulf States argues that its ratepayers were actually better off as the result of the plant's shutdowns, and thus contends that it should not be required to compensate its customers for a harm that they did not sustain.[15]
*1349 First of all, the RFO-2 outages all occurred in 1989, prior to the adoption of the deregulated asset plan in March of 1990. We agree with the Commission in that "applying an offset based on a plan that did not exist at the time to the outagesthose prior to March, 1990would unduly stretch an already dubious concept." The plan's effects on the overall fuel clause recovery by Gulf States will therefore not be considered with regard to the Commission's imprudence disallowances in those three outages.[16]
However, unlike the RFO-2 delays, the RFO-3 diesel generator fire occurred in December, 1990, subsequent to the adoption of the deregulated asset plan. The parties' arguments concerning the effect of the deregulated asset plan therefore apply in full force to the calculation of the disallowance for RFO-3.
Regarding those effects, the Commission contends that the entire difference between the 1 cent/kWh "avoided" cost of capacity from River Bend's regulated 53.4%, and the 1.8 cents/kWh market cost of providing capacity for Gulf States' ratepayers, should be disallowed. In other words, for every kilowatt hour of regulated replacement power made necessary by the generator fire, the Commission disallowed .8 cents. The Commission would therefore disallow all regulated purchased power costs, in excess of avoided cost, which resulted from the two days of delay in RFO-3 caused by Gulf States' imprudence.
Gulf States' contention that none of the purchased power costs from RFO-3 should be disallowed ignores its previous concession that it is to bear the risk, as to the deregulated 46.6% of its capacity, of any River Bend outage, and mistakes the nature of the exclusionary plan under which 46.6% of the Louisiana-jurisdictional portion of River Bend is unregulated. The essence of the plan is that such 46.6% of the plant's capacity is kept separate and apart from the oversight and regulation of the Commission, but that Gulf States may obtain rate support for its imprudent investment in that 46.6% capacity by selling, to off-system purchasers or to the regulated asset, at a rate of 4.6 cents/kWh, its electricity from the unregulated portion of River Bend. To use Gulf States' "merged" fuel clause approach would be to allow the company to mask the effects of its imprudence with regard to the regulated portion, leaving the Commission powerless to protect Gulf States' ratepayers from Gulf States' imprudence, and removing Gulf States' sole incentive to act prudently with regard to its regulated operations. See footnote 9 hereinabove.
The Commission properly separates the regulated portion of River Bend from the deregulated portion by disallowing the difference between the 1 cent/kWh cost of capacity generated by the regulated portion and the 1.8 cents/kWh market cost of purchased power, pursuant to Mr. Kollen's recommendation that "[i]n the case of River Bend and the RFO-3 outage addressed in my direct testimony, the utility's imprudent actions directly increased the fuel costs of the regulated portion of River Bend.... The amounts related to RFO-3 should be allocated between regulated and deregulated." Thus, the Commission correctly recognized that only 53.4% of its capacity is generated at the approximate cost of 1 cent/kWh. The other 46.6% capacity, which has never been sold anywhere but on-system, costs the ratepayers 4.6 cents/kWh. Therefore, as to deregulated 46.6% of the amount of replacement energy required during RFO-3, no disallowance was assessed because Gulf States' Louisiana-jurisdictional ratepayers did, in fact, save moneythey *1350 were able to buy capacity off-system for a price much lower than the 4.6 cents/kWh guaranteed to the deregulated portion. Regarding the other 53.4% of the required replacement regulated capacity, however, Gulf States' Louisiana-jurisdictional ratepayers did not save money, but rather paid approximately .8 cents/kWh more than they would have, had the regulated plant been operating.
Gulf States should be held responsible for the full extent of its imprudence with regard to the regulated portion of River Bend. To accomplish that end, the Commission adopted Mr. Kollen's recommendation, in which he bifurcated the regulated and deregulated portions, to disallow only $71,000 of the total Louisiana-retail disallowance of $156,000, plus interest, for a total of $79,000. By means of that disallowance, Gulf States was held responsible for its imprudence in the regulated portion, while also suffering the effects of its deregulated imprudence, represented by the loss of sales from the deregulated portion. The disallowance was fully supported in the record, and was therefore not arbitrary, capricious, or abusive of authority.

IV. Cajun Buy-Back Refund Interest
Finally, Gulf States contests that part of Order No. U-20647 directing it to refund $446,000 in interest stemming from an accounting error in its favor. In February of 1989, the company reviewed its prior fuel charge costs and discovered that it had failed to recover certain non-fuel purchased power costs, but also that it had improperly double-recovered other non-fuel operation and maintenance expenses associated with its Cajun River Bend buybacks, see footnote 10 hereinabove, by recovering them once through base rates and again through the fuel clause. The two errors were partially offsetting, and the company refunded the net overrecovery. Gulf States did not, however, include any amount of interest in its refund of that overrecovery, since its fuel clause mechanism contained no interest factor at the time. The Commission's expert, Mr. Kollen, recommended that the Commission order the company to refund the interest associated with the net overcollection, as the overrecovery was the result of multiple company errors, despite the lack of an interest factor in the fuel clause. The Commission ordered the company to refund that interest, and was upheld by the district court.
Fuel clause over- and under-recoveries typically result from lags in fuel costs, which are billed two months after they are incurred. To compensate for over- and under-recoveries, Gulf States utilizes an over-and-under collection mechanism that was implemented in connection with the Commission's grant of permission to Gulf States to employ "deferred fuel cost accounting" by Order Nos. U-13644 and U-13535 (La.P.S.C., 1978). In 1990, the Commission issued Order No. U-17282-H, in which it modified Gulf States' fuel clause mechanism to provide for the recovery of interest on over- and under-recoveries:
The Commission's expert consultant, Mr. Lane Kollen has recommended a modification to the Commission's fuel clause ... to permit interest to be recovered from ratepayers on under-recoveries and paid to ratepayers on over-recoveries.... The interest rate would be set at the existing overall rate of return authorized by the Commission. We believe that this proposal will more accurately permit recovery of the actual costs incurred for fuel and it will, therefore, be adopted. Order No. U-17282-H at 34 (emphasis supplied).
The parties do not dispute that, prior to this order (No. U-17282-H), no interest was recoverable by either the ratepayers or Gulf States on fuel clause over- and under-recoveries resulting from fluctuating fuel costs. The Commission nevertheless contends that Gulf States must pay interest on the Cajun over-recoveries, because such were not the result of any imbalance due to lags in tracking fluctuating fuel costs, but rather were the result of company error. According to the Commission, "When the Commission requires refunds of improper collections, it routinely requires the payment of interest on the refunds."
The Commission cites no authority for that proposition. It also fails to provide authority that would support a general proposition *1351 that, even without regard to the Commission's past practices relative to interest recovery by Gulf States' ratepayers, interest is due on overrecoveries by a utility.[17] In contrast, Gulf States points to three specific instances of past fuel clause corrections of errors unrelated to fuel-cost lags in which no interest was refunded to the consumer or credited to the company.[18] It is apparent that the Commission has not "traditionally" required Gulf States to make its refunds with interest, at least when those refunds are flowed through the fuel clause. And while the 1990 modification to Gulf States' fuel clause mechanism now imposes an interest obligation for both over-and under-recoveries, the Commission cites no authority for such an obligation prior to that modification. In its post-argument brief, the Commission argues that the over-and-under collection mechanism that Gulf States implemented in connection with the Commission's approval of deferred fuel cost accounting in Order Nos. U-13644 and U-13535 (La.P.S.C., 1978), "was intended for imbalances due to lags, however, and not for refunds relating to improper recoveries." Be that as it may, the fact remains that Gulf States' over-and-under recovery mechanism is one facet of Gulf States' overall fuel clause mechanism, through which Gulf States flowed the refunds at issue. If the Commission thought that such refunds were not proper for inclusion in the fuel clause, it should have required them to be considered in the calculation of base rates instead. It did not do so, and the refunds were passed through the fuel clause at a time when it did not contain any mechanism for the recovery of interest on refunds. Accordingly, we find that the Commission erred in ordering Gulf States to refund $446,000 in interest arising from Gulf States' admittedly improper double recovery, through the fuel clause, of the costs of the "Cajun buy-backs."

DECREE
For these reasons, the judgment of the district court is affirmed in part and reversed in part. The Commission's ordered refund of $13.7 million in NISCO double-charges responsive to the NISCO decision (which prompted the $.6 million controversy now before the Court) is affirmed. The Commission's disallowing an additional $5.82 million in NISCO double-charges passed through the fuel clause between October 1, 1988 and March 1, 1990 is affirmed. The Commission's disallowing $1.85 million in purchased power costs stemming from imprudent power outages at Gulf States' River Bend nuclear facility is affirmed. The Commission's ordering Gulf States to refund $.446 million in interest stemming from the Cajun refund is reversed. Accordingly, of the $8.716 million in refunds contested before this Court, $8.270 million are affirmed.
AFFIRMED IN PART, REVERSED IN PART, AND RENDERED.
NOTES
[*] Judge Graydon K. Kitchens. Jr., 26th Judicial District Court, and Judge Ian W. Claiborne, 18th Judicial District Court, participating as associate justices ad hoc in place of Justice Jack C. Watson and Justice E. Joseph Bleich.

Kimball, J., not on panel, Rule IV, § 3.
[1] Gulf States originally contested the entire $13.848 million, but dropped its appeal of certain refunds ordered by the Commission, relating to fuel transportation costs in the amount of $5.732 million, the inclusion of which in Gulf States' fuel adjustment clause ("fuel clause") was disallowed by the Commission. The issue of the propriety of those refunds was mooted in a subsequent commission proceeding which reallocated the costs from the fuel clause to base rates to allow GSU to recover them, by Order No. U-19904-D, dated October 7, 1996. Gulf States moved for partial voluntary dismissal of its appeal to this court, recognizing that "[t]he effect of LPSC Order No. U-19904-D is to make the Company whole with respect to SGT [Sabine Gas Transmission Company] capital costs by reducing the amount of the refund, thereby permitting the Company to retain amounts equivalent to the depreciation expense that would have been recovered through base rates." Coincident with the rendition of this opinion, that motion is being granted. Gulf States' appeal of those $5.732 million in refunds is dismissed.
[2] The present value of that gain was treated "below-the-line," meaning it was treated as non-utility revenue which benefitted only Gulf States' shareholders. The "gain" is quantified as the difference between (1) the net present value of the stream of $6.35 million payments Gulf States would receive from NISCO, and (2) the depreciated book value of the assets sold, which stood at approximately $9 million in the year 1986.
[3] Commission Order No. U-14964 of 1982 in part requires regulated utilities buying electricity produced by qualifying unregulated cogenerators under special conditions, rates, terms, etc., as provided in the order, to apply to the Commission for approval of the contract. The order contemplates that the purchase price will be at "avoided cost," defined as "the incremental costs to an electric utility of electric energy or capacity or both which, but for the purchase from the qualifying facility or qualifying facilities, such utility would generate itself or purchase from another source." However, § 201(b) of Order No. U-14964 allows the parties to negotiate a contract for a different rate, or term or condition, with Commission approval.
[4] In November 1989, Gulf States filed a rate increase application with the Commission relating to expenses associated with its River Bend nuclear plant, a facility unrelated to the NISCO venture. The proceedings in that application are discussed infra in relation to the matter of the Commission's disallowance of certain costs incurred at the River Bend plant.
[5] See supra footnote 1 and accompanying text.
[6] The Commission's review of Gulf States' fuel clause charges was instigated after the Texas Public Utilities Commission completed a fuel clause investigation of Gulf States and ordered refunds in the amount of $116 million for fuel clause overcharges from October 1, 1988 to September 30, 1991. For Gulf States' convenience, the Commission's review was divided into two phases. Phase I, the subject of Order No. U-20647, comprised the same period as the Texas investigation, October, 1988 through September 1991, so that the Commission could utilize the record from the Texas proceeding and alleviate the company's burden of reproducing the same data as had already been produced in Texas.
[7] On March 1, 1990, the Commission issued Order No. U-17282-H, by which it prospectively disallowed the inclusion of the NISCO double-charges in the fuel clause. Gulf States obtained a preliminary injunction as to the portion of the order requiring exclusion from Gulf States' fuel adjustment clause of any gain realized from the sale of the units in the NISCO transaction. Gulf States thus continued to double-charge its ratepayers until the date of the NISCO decision, March 17, 1994.
[8] Retroactive ratemaking is prohibited because the Commission's "exercise ... of its ratemaking authority is primarily a legislative function, which, in the absence of constitutional or statutory authority to the contrary, is limited to fixing rates to be applied prospectively." South Cent. Bell, 594 So.2d at 359. Retroactive ratemaking generally occurs "when a utility is permitted to recover an additional charge for past losses, or when a utility is required to refund revenues collected pursuant to its lawfully established rates." Id. (citations omitted).
[9] A utility may only recover those portions of its investments that are prudently incurred, under the "prudent investment standard" articulated by this Court in Gulf States Utilities Co. v. LPSC, 578 So.2d 71, 84-85 n. 6 (La.1991) ("The principle of prudence has developed in part to counterbalance the monopoly power of public utilities."). Because customers of a monopolistic enterprise do not have the choice to take their business to a more efficient provider, market forces provide no incentive to utilities to act prudently. Therefore, a utility's only motivation to act prudently "arises from the prospect that imprudent costs may be disallowed." See In Re Long Island Lighting Co., 71 P.U.R. 4th 262 (N.Y.P.S.C.1985).
[10] Gulf States owns 70% of River Bend, reflecting an investment of approximately $3 billion; the remaining 30% is owned by Cajun Electric Power Cooperative. Pursuant to its formal agreement with Cajun, Gulf States was obligated to "buy back" a decreasing amount of electricity from Cajun's portion for the first five years of River Bend's operation.
[11] The specifics of each of these outages are examined in an unpublished appendix to this opinion.
[12] The Commission's expert, Lane Kollen, articulated the "no harm, no foul" rule for disallowances in his Surrebuttal Testimony, where he stated: "[I]n order for a disallowance to follow a finding of imprudence, there should be a quantifiable harm to the ratepayers. This is the so-called `no harm, no foul rule.'"
[13] A slightly different version of this plan was initially proposed by the Commission in Order No. U-17282-D, in response to a similar, but more company-favorable plan proposed by Gulf States. The initial Order specified that if Gulf States rejected the rate base exclusion plan, the findings and conclusions of its previous order, No. U-17282-C, were to be reinstated. Order No. U-17282-C similarly disallowed the imprudent investment, but contained "no ameliorative provision regarding the disallowed portion of the River Bend investment." Gulf States I, 578 So.2d at 97.

On October 11, 1989, the district court affirmed the Commission's finding of imprudence, but also ordered the implementation of the rate base exclusion plan proposed by the Commission. Both parties appealed the district court's ruling to this Court. While that appeal was still pending, the Commission implemented the deregulated asset plan by Order No. U-17282-H, dated March 1, 1990. Subsequently, this Court held that the district court was without constitutional authority to order the plan's implementation, and thereby reversed and set aside that portion of the district court's judgment. Gulf States I, 578 So.2d at 100. The Commission subsequently issued Order No. U-17282-K, by which it modified the plan it previously implemented in Order No. U-17282-H. The primary change was a reduction in the Commission's share of potential revenues from off-system, non-economy sales, from U-17282-D's 60% of amounts over 4.6 cents/kWh, to 50% of such amounts.
[14] Presumably, the reason that Gulf States has not sold any of its deregulated capacity off-system is that, at the prevailing rates from the inception of the deregulated asset plan to the present, the market price of energy has been less than 4.6 cents/kWh. Unless and until the market price per kilowatt hour rises above the regulated entity's guarantee of 4.6 cents/kWh, Gulf States will logically sell its deregulated capacity only to the regulated entity.
[15] Note the obvious concern this raises regarding the ability of Gulf States to best serve the interests of the ratepayers by continuing to operate River Bend. Unless and until the "merged" fuel clause recovery is less than the market cost of purchased power, ratepayers would clearly be better off if River Bend did not operate. The Commission recognized this problem in Order No. U-20647, at 61, where it stated: "In view of the company's evidence, however, which clearly shows a short term harm from running River Bend, the Commission may consider whether the unit is economic in the long term. If not, the prudent decision may require a permanent shutdown of River Bend."
[16] Gulf States argues that these outages, although occurring prior to the plan's adoption, nevertheless affected the fuel clause after the plan was adopted and during the review period at issue in this case. That argument is premised on the fact that Gulf States' recovery for the deregulated asset is based on a rolling 36-month average electric output of the plant.

Gulf States' argument is meritless. These outages took place prior to the plan's adoption, and thus the replacement power necessary to compensate that loss of capacity was purchased prior to the adoption of the plan. The proper disallowance would thereby be determined by calculating the amount that the market cost of the replacement power exceeded the avoided cost of Gulf States' producing the electricity itself. When Gulf States recovered that difference from its ratepayers through the fuel clause is irrelevant to the effects of the deregulated asset plan which was adopted later.
[17] The Commission points to a recent refund by Gulf States, made pursuant to a settlement with the Commission, in which interest was included on the amount overcollected by the company. That interest, however, was refunded as part of a settlement agreement that also granted the company the right to increase its base rates by $8.1 million per year. As correctly noted by Gulf States, such a settlement agreement is irrelevant to the question of whether the company was obligated to refund interest on overrecoveries passed through the fuel clause prior to the 1990 modification of the fuel clause which now provides for interest.
[18] On October 22, 1982, Gulf States filed a Fuel Adjustment Clause Filing which evidenced the company's correction of an undercollection which was not due to a lag in fuel recovery, but rather to the improper calculation of a rate increase, and no interest was charged to the company's customers. In June of 1983, Gulf States' Fuel Adjustment Clause Filing showed a correction relating not to fuel lags but to underrecovered costs from a power supplier, Sam Rayburn Co-Operative, and no interest was charged to customers. Finally, in July of 1986, Gulf States' Fuel Adjustment Clause Filing shows an underrecovery correction, not due to lags in fuel costs, but rather to the reclassification of certain off-system sales, and no interest was charged to the company's customers.